C. L. THOMAS, Plaintiff,

v.

John T. MARSHALL, C. Warren Stone and Pat T. McInnis, Trustees of Palmer & Baker Engineering Associates Retirement Plan, jointly and severally, Defendants.

Civ. A. No. 78–359–H.

United States District Court,
S. D. Alabama, S. D.

Dec. 4, 1979.

As Amended Dec. 28, 1979.

B. Pratt Gasque, Jr., Mobile, Ala., for plaintiff.

James E. Moore, William B. Harvey, and James Donald Hughes, Mobile, Ala., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, District Judge.

This case involves a claim for pension benefits beyond those which the trustees have tendered to the plaintiff. The trustees, in the answer, deny that any amount is owing except that which has been tendered to the plaintiff and ask for a declaratory judgment to that effect. After taking evidence during a short, non-jury trial, after hearing argument from counsel, after considering their briefs, and after considering the applicable law the Court makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

### I. FINDINGS OF FACT

1. The plaintiff, C. L. Thomas, was an employee of Palmer & Baker Engineers, Inc. for nearly twenty-five years. He began working for the company on January 8, 1949 and continued working without a

break until May 31, 1975. The defendants are trustees of the Palmer & Baker Engineering Associates Retirement Plan.[1]

2. On December 1, 1951 Palmer & Baker Engineering Company began a defined benefit pension plan for its employees. The plaintiff was a participant in the defined benefit plan[2] from its inception on December 1, 1951. And, until the time he left the employment of Palmer & Baker, the plaintiff was always a participant in a pension plan administered for Palmer & Baker employees. Under the original, defined benefit pension plan each participant accrued benefits which were to be paid to the participant in the form of an annuity beginning at age 65. The amount of the annuity depended upon the highest annual, average salary and upon the years of service which the participant had with Palmer & Baker Engineers, Inc. The defined benefit plan was funded by contributions made by Palmer & Baker Engineers, Inc. At the time the defined benefit plan was amended the plaintiff was not vested under the terms of the defined benefit plan.[3]

3. The date on which the defined benefit plan was amended was the subject of great dispute at trial and, indeed, in the post-trial briefs. That the original defined benefit

1. The amended complaint named John T. Marshall, C. Warren Stone and Pat T. McInnis, jointly and severally, as the trustees of the Palmer & Baker Engineering Associates Retirement Plan, as the defendants in this action. Only John T. Marshall was served with a summons and complaint.

2. See ERISA § 3(35), 29 U.S.C. § 1002(35) (1976) (definition of defined benefit plan). Under a defined benefit plan each participant draws his accumulated benefits from a common fund. Under a defined benefit plan a participant is promised a fixed, monthly benefit level for each year of service.

3. The vesting provisions in the defined benefit plan were contained in Article VI which, in part, provided:

ARTICLE VI
RETIREMENT BENEFITS

6.01. The Normal Retirement Date of each Participant will be the Anniversary Date nearest his 65th birthday. Commencing as of that date, each Participant whose Service continues to that date will be entitled to a monthly amount of Normal Annuity equal to the sum of (a) 2% of his Benefit Compensation multiplied by that portion of his Service which is not in excess of 25 years, and (b) 1/4 of 1% of his Benefit Compensation multiplied by that portion of his Service which is in excess of 25 years but not in excess of 40 years.

6.02. A Participant while in the employ of a Participating Company may retire prior to his Normal Retirement Date but only because of disability resulting from physical or mental illness or injury, which will thereafter prevent the Participant from performing the usual duties of his occupation, the existence of such disability to be established to the satisfaction of the Board by the Participant's employer by evidence submitted by the Participant. The Early Retirement Date of a Participant who has established such disability will be the first day of the calendar month which is coincident with, otherwise which next follows, the date he ceases active work. Commencing as of that date the Participant will be entitled to a monthly amount of normal Annuity equal to the actuarial equivalent of his Accrued Benefit payable at Normal Retirement Date.

6.03. If requested by the Board of his employer, a Participant may, if he consents in writing at least 30 days prior to his Normal Retirement Date, remain in active employment on a year to year basis after reaching his Normal Retirement Date. If it is agreed that a Participant shall continue in employment after reaching his Normal Retirement Date, his retirement benefit will not commence until his Deferred Retirement Date which will be the first day of the calendar month which is coincident with, otherwise which next follows, the date he ceases active work. Commencing as of that date, the Participant will be entitled to a monthly amount of Normal Annuity equal to the actuarial equivalent of his Accrued Benefit, payable at Normal Retirement Date.

6.04. In the event the Termination of Employment of a Participant is voluntary on his part, he shall not be entitled to any benefit under the Plan.

6.05. In the event the termination of employment is involuntary on his part and occurs at least five years after the effective date of his participation, except as hereinafter otherwise provided, he will be entitled to a monthly, normal annuity, commencing at his normal retirement date, in an amount equal to his accrued benefit. If a participant is discharged for dishonesty or insubordination, commission of a misdemeanor involving moral turpitude or felony, he shall thereby forfeit the right to benefits under the plan which he otherwise would have had.

1969 Palmer & Baker Defined Benefit Plan, Plaintiff's Exhibit No. 1.

plan was amended, because the company was unable to meet the funding requirements, is clear. The only important question with legal significance is: when was the defined benefit plan amended.

4. The position of the defendants with regard to the date on which the defined benefit plan was amended shifted during the course of the litigation. In their pretrial brief the defendants asserted that the trustees amended the pension plan in 1975 after recognizing that the company would not be able to meet its funding obligations under the funding schedule. At trial the defendants argued that trustees modified the original defined benefit plan on November 12, 1974 and that that action served to retroactively amend the original pension plan as of December 1, 1973. The new pension plan, a money purchase pension plan,[4] relieved the company of its funding requirement, a funding requirement which had become onerous as the company moved toward bankruptcy. And, despite putting on evidence at trial showing that the defined benefit plan was amended on November 12, 1974, the post-trial brief of the defendants urged that the real date which the Court should consider to be the date upon which the original pension plan terminated was August 7, 1974.[5] The Court finds that November 12, 1974 was the date on which the trustees acted to modify the original defined benefit plan by adopting a money purchase plan.

5. After adopting the money purchase pension plan the trustees applied the funds which had been contributed to fund the defined benefit plan into a general account for the participants of the money purchase pension plan. The money purchase plan called for the establishment of separate accounts, the usual practice for that type of pension plan. See Plaintiff's Exhibit No. 2 at p. 11 (participant's accounts). The separate accounts were never established.[5.1]

6. After the defined benefit plan was amended the plaintiff participated in the money purchase pension plan until he left the employment of Palmer & Baker Engineers, Inc. on May 31, 1975. On August 20, 1976 the plaintiff made a written request to the trustees asking that all of the monies in his money-purchase-pension-plan account be transferred to an independent-retirement account which the plaintiff maintained. The trustees refused to transfer the plaintiff's retirement benefits unless the plaintiff executed a release-and-indemnity agreement, which agreement had the effect of relieving the trustees from all liability and claims for benefits which the plaintiff might make. The plaintiff refused to sign this release-and-indemnity agreement.

4. See ERISA § 3(34), 29 U.S.C. § 1002(34) (1976) (definition of money purchase pension plan). In a money purchase pension plan each participant has a separate account. Upon retirement the participant is entitled only to the amount of money which is actually in the account. In a sense a money purchase pension plan is much like an individual savings account.

5. The defendants ingeniously argue that August 7, 1974, rather than November 12, 1974, was the date on which the pension plan was amended because it was on August 7th that the trustees apparently resolved to change the pension plan from a defined benefit plan to a money purchase pension plan. To begin with, the Court notes that the resolution to do an act is not identical with the actual performance of an act. Secondly, this post-trial argument contradicts the evidence offered at trial by the defendants themselves. At trial the defendants admitted that the money purchase pension plan was executed on November 12, 1974. See Plaintiff's Exhibit No. 2 (copy of amended pension plan). After admitting that fact the defendants argued that the *effect* of the new pension plan should be retroactive to December 1, 1973. The Court rejects the legal argument of the defendants. Generally an instrument only has prospective rather than retroactive effect. An instrument is effective as of the date on which it is executed. Unless there is mutual agreement between the parties to a contract no instrument can be interpreted by a court as having retroactive effect. Moreover, where parties agree to give an instrument retroactive effect in order to escape the requirements of the law the courts refuse to give effect to the instrument as a matter of public policy.

5.1. Separate accounts were never established in the sense that each participant's funds were placed in an account which had that participant's name on it. Rather, the contributions for all of the participants were pooled together for investment purposes, and the separate accounts were established via a bookkeeping entry.

When negotiations between the parties collapsed this law suit was initiated.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action under section 502(e)(1) of ERISA. 29 U.S.C. § 1132(e)(1).

2. As of September 2, 1974 freedom of contract was largely eliminated from the world of pension agreements. On that date the Employee Retirement Income Security Act of 1974 became effective. 29 U.S.C. §§ 1001–1381. ERISA was designed to curb abuses which had become commonplace in the pension world, threatening the retirement income of millions of employees and their dependents. ERISA § 2, 29 U.S.C. § 1001 (congressional findings and declaration of policy). The Act represents an effort by Congress to implement a comprehensive law regulating all major aspects of pension agreements and pension administration. Some of the stringent regulatory provisions in the Act deal with reporting and disclosure,[6] participation and vesting,[7] funding,[8] fiduciary responsibility,[9] and administration and enforcement.[10] To insure both implementation of and compliance with this comprehensive legislation, Congress made extensive amendments to portions of the Internal Revenue Code[11] and provided for executive oversight of pension plans by the Departments of Treasury and Labor.[12] And, in order to protect the retirement income of those who are dependent upon pension benefits, Congress set up a system of pension insurance whereby pensioners' benefits would be insured under an insurance program which was funded by the employers themselves.[13] It is against this legal background that the Court must decide this case.

### A. Applicability of ERISA

3. Before the Court can decide how much Mr. Thomas is entitled to recover under the defined benefit plan the Court must consider whether ERISA applies. In passing on this the Court notes that the defined benefit plan existed after September 2, 1974. The argument that the resolution of the trustees on August 7, 1974 changed the pension plan from the defined benefit plan into a money purchase plan is not persuasive. Action is effective as of the date upon which it is taken. In this case the defined benefit plan was not amended until November 12, 1974, the date the amended pension plan was executed. Therefore, it is the conclusion of this Court that whatever the outcome is in this case ERISA must be considered.

### B. Defined Benefit Plan
#### 1. Vested Benefits or Not?

4. Under ERISA the outcome in this case is radically different depending on whether the benefits which were accruing under the defined benefit were vested.[14] In

---

6. ERISA §§ 101–111, 29 U.S.C. §§ 1021–1031 (1976).

7. ERISA §§ 201–211, 29 U.S.C. §§ 1051–1061 (1976).

8. ERISA §§ 301–306, 29 U.S.C. §§ 1081–1086 (1976).

9. ERISA §§ 401–414, 29 U.S.C. §§ 1101–1114 (1976).

10. ERISA §§ 501–514, 29 U.S.C. §§ 1131–1144 (1976).

11. Title II of ERISA amends those portions of the IRC which relate to retirement plans. ERISA §§ 1001–2008.

12. ERISA §§ 3001–3042, 29 U.S.C. §§ 1201–1242 (1976).

13. ERISA §§ 4001–4082, 29 U.S.C. §§ 1301–1381 (1976).

14. In *Nachman v. PBGC*, 592 F.2d 947 (7th Cir. 1979), *cert. granted*, 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979), the Seventh Circuit Court of Appeals held that "ERISA does subject the plaintiff [the employer] to liability for the payment of unconditionally vested benefits effective September 2, 1974 and that this construction does not contravene the Due Process Clause of the Constitution." 592 F.2d at 950. Only after concluding that the benefits at issue in *Nachman* were vested under the terms of the pension plan did the court conclude that Title IV insures the payments of the vested—i. e. nonforfeitable—benefits. Nachman Corp. brought the action in district court seeking a declaratory judgment that Title IV did not impose liability upon it. Defendants in the action

determining whether Mr. Thomas' benefits under the defined benefit plan were vested or not, the first place to turn is to the four corners of the pension plan itself. Article VI of the pension plan—entitled "Retirement Benefits"—defines the conditions under which a participant is entitled to vested benefits.[15] Generally, under the terms of the defined benefit plan a participant was required to work until his sixty-fifth birthday before benefits vested.[16] In limited circumstances, where the participant became disabled because of some physical or mental illness or injury, early retirement with vesting was permitted.[17] The defined benefit plan specifically excludes vesting where the participant voluntarily quits.[18] Thus, under the terms of the pension plan, the usual circumstances under which benefits vested were upon normal retirement at age sixty-five.

■ 5. In this case there is no evidence that Mr. Thomas was entitled to any early retirement because of some physical or mental illness or injury—one circumstance under which benefits could vest. Neither did the plaintiff participate in the defined benefit plan until age sixty-five, his normal retirement age under the terms of the pension plan, because the pension plan was amended before the plaintiff reached age

sixty-five. Thus, the plaintiff's rights did not vest under any of the alternative vesting provisions allowed under the terms of the pension plan. Accordingly, it is the conclusion of the Court that the plaintiff did not have any vested benefits under the terms of the pension plan itself.

■ 6. However, one must go further than the four corners of the pension agreement in order to determine whether benefits are vested once it is determined that ERISA applies to the pension plan. Title I of ERISA [19] imposes certain vesting requirements on pension agreements, which requirements, as a matter of law, supercede the terms of the pension agreement. In this case, however, the vesting provisions of Title I do not act to vest benefits in the plaintiff because the vesting provisions of Title I were not yet effective while the defined benefit plan was in existence. Section 211(a) [20] generally provides that the vesting provisions of Title I apply immediately to plan years beginning after September 2, 1974. Section 211(a) was intended to cover any pension plan which began shortly after the passage of ERISA. The exceptions to section 211(a), contained in section 211(b),[21] control in this case. For pension

---

were the PBGC and the union which had negotiated the pension plan during collective bargaining, the United Auto Workers.

The procedural posture in which *Nachman* was presented to the district court is materially different from the case at bar: the PBGC was a party in *Nachman*. Only where the plaintiff is "adversely affected by any action" of the PBGC may a participant name the PBGC as a party and litigate the provisions of Title IV. ERISA § 4003(f), 29 U.S.C. § 1303(f). It is the PBGC which is charged with administering "[t]he purposes of [Title IV of ERISA]." ERISA § 4002(a), 29 U.S.C. § 1302(a). Unless the PBGC is a party to an action private litigants lack standing to litigate the provisions of Title IV. Had this suit dealt exclusively with the provisions of Title IV the Court would have been bound to dismiss the action for both lack of standing, ERISA § 4003(f), 29 U.S.C. § 1303(f), and for failure to exhaust administrative remedies. ERISA § 4002(a), 29 U.S.C. § 1302(a). The extensive argument over various provisions of Title IV—both in briefs and during oral argument—proved nothing.

The administrative apparatus of the PBGC could be triggered in several ways. Upon the occurrence of certain events the PBGC must be notified. ERISA § 4043(b), 29 U.S.C. § 1343(b). Or, before a pension plan which is covered by Title IV can be terminated, the PBGC must be notified. *See* ERISA §§ 4041, 4042, 29 U.S.C. §§ 1341, 1342.

15. *See* note 3 *supra* (text of Article VI).

16. 1969 Defined Benefit Plan at ¶ 6.01.

17. *Id.* at ' 6.02.

18. *Id.* at '‌ 6.04.

19. ERISA §§ 2–514, 29 U.S.C. §§ 1001–1144.

20. 29 U.S.C. § 1061(a) (effective dates of participation and vesting provisions).

21. 29 U.S.C. § 1061(b).

plans which were on-going on September 2, 1974, such as the Palmer & Baker defined benefit plan, the vesting provisions of ERISA were delayed until December 31, 1975.[22] Therefore, the plain terms of the statute would not apply the vesting provisions of Title I so as to give the plaintiff that which the defined benefit plan failed to give: vested benefits for the twenty-three years which the plaintiff had participated in the pension plan. Had the defined benefit plan continued to operate after December 31, 1975 the vesting provisions of Title I would have kicked in and the hardship presented by this case would have been avoided.

**22.** ERISA § 211(b)(2), 29 U.S.C. § 1061(b)(2).

**23.** Article VIII of the money purchase plan set forth the following distribution formula:

8.02 Assets of the Trust on November 30, 1973 arising from contributions made prior to this date shall be allocated to Participants of the Plan on December 1, 1973 in the proportions determined by the Trustees.

This distribution of the Trust Fund defined as the Transfer Amount shall be allocated to Participant's Transfer Accounts as follows:

$$TA = \frac{110 \ (MS)}{1.06E} \ \ (Final \ \%) - (.015E)$$

TA is Transfer Account of any Participant. MS is Participant's Monthly Salary as of November 30, 1973 or effective Monthly Salary if Participant is older than 60 on November 30, 1973. E is the number of years to Normal Retirement Date from December 1, 1973. (Final %) is Participant's earned percentage of monthly salary at Normal Retirement under Plan prior to this amendment. (2% for first 25 years plus 1/4 of 1% for each year 26 through 40).

The Transfer Account of each Participant shall be credited with the amount determined as shown above effective December 1, 1973. It is recognized that the Transfer Amount is deficient to some extent to fully fund the individual Transfer Account. The Company shall, from time to time, make contributions against this deficit.

8.03 a. As of each January 1, the effective date, beginning with January 1, 1974, each Participant's Regular Account is due to be increased by an amount B contributed by the Company and determined in accordance with the following formula:

$$B = \frac{1.65 \ (W2)}{12 \times (1.06)^{n-1}}$$

W2 is the total compensation shown on the Participant's W2 form issued by his Participating Company for the calendar year preceding such January 1.

## 2. Tax Qualified or Not?

7. During the course of this litigation the plaintiff vigorously argued that the funds from the defined benefit plan were required under the terms of ERISA to be distributed on the pro rata basis set forth by the statute. ERISA § 4044(b)(2), 29 U.S.C. § 1344(b)(2). This method of distribution was more favorable to the plaintiff than the distribution formula contained in the money purchase plan.[23] Plaintiff sought the pro rata distribution provided by section 4044(b)(2) by arguing: a) that Title IV applied and b) that Title I applied. Obviously, the plaintiff lacks standing to raise Title IV in this litigation.[24] Plaintiff's ar-

n is the number of years from the effective date to January 1 closest to the Participant's Normal Retirement Date.

b. The Amount B is payable by the Company to the Trust Fund by December 31 of the year including the effective date. Such amount shall be credited to each Participant's Regular Account on the January 1 following the effective date.

c. The Transfer Account of each Participant shall earn interest at the rate of 6% per annum compounded on the first day of each year or to the first of the month following the date of withdrawal for whatever reason.

d. The Regular Account of each Participant shall earn interest at the rate of 6% per annum compounded on the first day of each year or to the first day of the month following withdrawal for whatever reason.

1974 Money Purchase Plan at article VIII, Plaintiff's Exhibit No. 2.

**24.** *See* note 14 *supra*.

Recognizing that nothing in Title IV is before the Court, and without deciding the issue, it is questionable whether Title IV offers any relief to the plaintiff. Section 4021 of Title IV, 29 U.S.C. § 1321, provides that all plans which are established by an employer who is engaged in commerce or in an industry affecting commerce and which are tax exempt are subject to the terms of the termination insurance program. Assuming for the moment, without deciding, that the defined benefit plan was tax exempt so as to draw the defined benefit plan within the scope of coverage afforded by § 4021(a) no nonforfeitable benefits existed which the PBGC would guarantee under § 4022. That conclusion follows because the plaintiff did not have any vested benefits. *See Nachman v. PBGC,* 592 F.2d 947, 954–56 (7th Cir. 1979), *cert. granted,* 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979) (concluding that the term *nonforfeitable* is identical with the term *vested* ). Since there were no guaranteed

gument under Title I, however, is properly raised before this Court.

8. Since, in this case, it is arguable whether the defined benefit plan was tax qualified the Court must concern itself with the consequences which would flow from the pension plan being unqualified between the passage of ERISA and the date when the defined benefit plan was amended, on November 12, 1974. Plaintiff argued that if the defined benefit plan was unqualified at some point then section 403(d)(1)[25] would operate so as to require that the assets of the fund were distributed to the participants on a pro rata basis as required by section 4044.[26] The problem with this argument is that section 403(d)(1) is inapplicable unless the fiduciary-responsibility provisions of part 4 of Title I of ERISA apply. Therefore, before one can rely upon any provisions of the fiduciary-responsibility provisions of part 4 one must first determine whether part 4 applied to the Palmer & Baker defined benefit plan at anytime from September 2, 1974, the effective date of ERISA, until November 12, 1974, the date on which the defined benefit plan was amended.

9. Section 414[27] provides that in general the provisions of part 4 were to take effect on January 1, 1975.[28] Since the defined benefit plan was amended on November 12, 1974 the fiduciary-responsibility provisions of part 4 were not yet effective.

---

benefits, section 4041(f), 29 U.S.C. § 1341(f), did not operate to terminate the defined benefit plan within the meaning of Title IV when the November 12, 1974 amendment was adopted which converted the defined benefit pension plan into a money purchase plan. *A fortiori* section 4044(b)(2) does not require that the funds in the defined-benefit-plan fund be allocated pro rata among the participants of the defined benefit plan.

25. 29 U.S.C. § 1103(d)(1) (termination of plans not covered by section 4021 of Title IV).

26. *Id.* at § 1344.

27. *Id.* at § 1114.

28. The only exception to the January 1, 1975 effective date set forth in § 414(a), 29 U.S.C. § 1114(a), which is arguably relevant is § 414(b)(3). 29 U.S.C. § 1114(b)(3). Section 414(b)(3) provides that part 4 of Title I was to take effect on September 2, 1974—the effective date of ERISA generally—in a narrow class of pension plans. That class included all pension plans which were covered by Title IV and § 4021 which were terminated before January 1, 1975, the date upon which part 4 of Title I was generally to take effect. In other words, what Congress wanted to do was to delay the effective date of part 4 *except* in those few cases where a pension plan covered by the termination insurance provisions of Title IV was terminated. In those narrow circumstances, since the PBGC was risking its insurance fund, Congress thought that the pension fund should be subject to the fiduciary-responsibility provisions of part 4.

The exception afforded by § 414(b)(3) does not help the plaintiff in this case: it only operates if the pension plan was covered by § 4021. As already noted, if § 4021 applied, then the plaintiff lacks standing to assert any claim because he failed to exhaust his administrative remedies. If the plaintiff is traveling under Title I and its section 403(d)(1) then the Court must assume that the defined benefit plan was unqualified on November 12, 1974, and since § 4021 would not apply, the general effective date of part 4, January 1, 1975, would apply. That being the case, nothing in § 403(d)(1) mandates that the monies in the defined-benefit-plan fund be disbursed on a pro rata basis because § 403(d)(1) was not yet effective.

As a matter of simple logic neither § 4021 nor § 403 require that the assets in the defined benefit fund be distributed in a pro rata fashion as required by § 4044. Assume for purposes of analysis under Title IV and § 4021 that the plan was tax qualified—an assumption which is not clearly established by the record. Even if the pension plan was tax qualified and part of the class of pension plans covered by Title IV, § 4044 would not operate because there were no nonforfeitable benefits—vested benefits—which would be guaranteed by the PBGC. Now, for the sake of argument, assuming that the defined benefit plan was unqualified at some point, section 403(d) would not entitle the plaintiff to a pro rata distribution of the assets in the defined benefit fund because section 403(d) was not yet effective. In short, whether one assumes that the defined benefit plan was tax qualified or that it was unqualified, the plaintiff is not entitled as a matter of law to a pro rata distribution of the assets of the defined benefit fund. Although this conclusion seems inequitable, on November 12, 1974 federal law had not yet imposed any vesting requirements or distribution formulas upon the Palmer & Baker pension plan. The frustrated expectations of this plaintiff, a participant in a defined benefit plan for twenty-three years, serve as a vivid example of the need for a comprehensive law to regulate pension plans.

Therefore, section 403(d)(1) would have no field of operation over the distribution of the assets in the defined benefit fund. Accordingly, the defendants were under no obligation to distribute funds on the pro rata basis set forth in section 4044(b)(2).

### C. Money Purchase Plan

■ 10. In contrast to the result under the defined benefit plan, the plaintiff is entitled to some pension benefits from the amended plan,[29] the money purchase plan. Even the trustees do not dispute this. The only question for the Court to resolve is the question of how much money the plaintiff is entitled to under the terms of the money purchase plan. Absent any legal requirements imposed by ERISA the trustees and the company are free to allocate the retirement assets in whichever manner they prefer. The Court is aware of no provision in Title I of ERISA which requires that a particular distribution formula be used. Nor is the Court aware of any provision in Title I of ERISA which requires that one distribution formula be preferred over another distribution formula. Hence, the distribution formula set out in the money purchase plan is determinative of the amount of the retirement benefits to which Mr. Thomas is entitled.

■ 11. Section 8.02 of the money purchase plan sets out a formula by which the funds in the trust shall be distributed.[30] When this formula is applied to Mr. Thomas' retirement benefits the amount owing to Mr. Thomas under the money purchase plan is $14,512.17. That is the amount which the trustees originally tendered to Mr. Thomas on April 3, 1978. Since, as the Court has already noted, there is nothing in ERISA which requires that a different distribution formula be used than the one used in the 1974 plan the Court must conclude that Mr. Thomas has been tendered all that he is entitled to under the distribution formula of the 1974 money purchase plan.

■ 12. In reaching the conclusions which the Court reaches it is important to note the issues which the Court is not asked to decide in this case.[31] To begin with the trustees were sued only in their representative rather than their individual capacities. Indeed, the only trustee who was ever served was John P. Marshall. Neither C. Warren Stone nor Pat T. McInnis were ever served, either in their representative capacities or in their individual capacities. Because the trustees were sued only in their representative capacities the Court has not been presented with the question whether the trustees violated any fiduciary responsibility owing under either the terms of the 1974 money purchase plan or under Title I of ERISA.

### D. Attorney Fees

13. Both parties have asked for awards of attorney fees.[32] Before reaching the merits of the parties' arguments several preliminary matters must first be noted. Section 502(g) only provides for an award of attorney fees when an action is brought

---

**29.** During the course of this litigation counsel for both sides spent a lot of time arguing about what the effect of the November 12, 1974 resolution was. That is, did the November 22, 1974 resolution serve to terminate the defined benefit plan or to amend the defined benefit plan. The terms of the defined benefit plan provide for amendments to the defined benefit plan. Moreover, the money purchase plan specifically states that it is an amendment to the predecessor plan. Nothing in ERISA of which the Court is aware operates to characterize the November 12, 1974 action of the trustees as a termination rather than an amendment. Therefore, it is the conclusion of the Court that the November 12, 1974 action of the trustees was an amendment rather than a termination.

**30.** See note 23 supra (distribution formula).

**31.** "There is no basis for res judicata unless something is adjudged. It matters not if the thing demanded [in a second action] be the same or the cause of action and the parties be identical. . . . Without a judgment on the merits nothing is adjudicated." Continental Cas. Co. v. Canadian Univ. Ins. Co., 605 F.2d 1340, 1343 (5th Cir. 1979) (citations omitted).

**32.** Section 502(g) provides: "In any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." (emphasis added). 29 U.S.C. § 1132(g).

under Title I of ERISA.[33] The complaint invokes jurisdiction under section 502, 29 U.S.C. § 1132, but does not refer to any of the provisions of Title I. While that certainly is not dispositive under the simplified notice pleadings envisioned by the federal rules of civil procedure, the entire case was argued and tried by the plaintiff under the substantive provisions of Title IV, which deals with the termination insurance provisions of ERISA. The plaintiff had no claim for relief under Title IV. *See* notes 14 & 33 *supra* (discussing actions under ERISA § 4003(f)). Claims stated in the complaint which might be actionable under the fiduciary-responsibility provisions of Title I alleging a breach of the trustees' fiduciary responsibility would necessitate personal jurisdiction over the trustees. ERISA § 409, 29 U.S.C. § 1109. The trustees were *never* served in their individual capacities.[34]

This action did nothing to resolve the trustee's personal liability, *if any*, for any breach of a fiduciary duty owed under either the terms of ERISA or the money purchase pension plan. The only Title-I issue raised by the plaintiff in this action was the vesting issue.

14. Like the plaintiff, the issues resolved by the defendants under Title I were narrow. The counterclaim of the defendants [35] sought a declaratory judgment [36] that the amount of retirement benefits which the trustees had tendered to the plaintiff were, in fact, all that the plaintiff was entitled to. The resolution of this question involved the application of the vesting provisions of Title I to the defined benefit plan. ERISA §§ 201–211, 29 U.S.C. §§ 1051–1061. Since the complaint, too, requested relief which would involve the application of the vesting

**33.** Section 502(g), 29 U.S.C. § 1132(g) allows attorney fees to be awarded in actions brought "under this subchapter." Title I of ERISA contains substantive provisions relating to reporting and disclosure, ERISA §§ 101–111, 29 U.S.C. §§ 1021–1031, participation and vesting, ERISA §§ 201–211, 29 U.S.C. §§ 1051–1061, funding, ERISA §§ 301–306, 29 U.S.C. §§ 1081–1086, fiduciary responsibility, ERISA §§ 401–414, 29 U.S.C. §§ 1101–1114, and administration and enforcement of the Act. ERISA §§ 501–514, 29 U.S.C. §§ 1131–1144. Title IV provides private causes of action only in very limited circumstances. Title IV deals with the termination insurance provisions of the Act and the structure of the insurance program. The narrow situation where a private cause of action exists under Title IV is when a participant or plan administrator is adversely affected "by any action of the corporation . . . ." ERISA § 4003(f), 29 U.S.C. § 1303(f). The PBGC was not named as a defendant in this suit. Nor were the trustees in this case appointed by the PBGC. Therefore, under the plain terms of Title IV, the plaintiff in this case does not have a claim for relief under Title IV. The plaintiff's claim(s) could arise only under Title I. *See* note 14 *supra*.

Likewise, the counterclaim asserted in the defendant's answer does not state a claim for relief under Title IV for the simple reason that there has been no action by the corporation—the PBGC—which has adversely affected the plan administrators. ERISA § 4003(f), 29 U.S.C. § 1303(f). Nowhere in Title IV is there any provision for attorney fees to a prevailing plaintiff under § 4003(f).

**34.** Section 409, 29 U.S.C. § 1109, establishes a claim for relief against a fiduciary who breaches any of the duties imposed by § 404, 29 U.S.C. § 1104. However, merely because Congress created a right which can be enforced in federal court—creating subject-matter jurisdiction—the supposed defendants must be brought within the personal jurisdiction of the court. Without both subject-matter jurisdiction and personal jurisdiction a court lacks power to enter a binding judgment. *See* ERISA § 502(d)(2), 29 U.S.C. § 1132(d)(2).

**35.** The counterclaim prayed that

the Court to [sic] find that the Trustees (Defendants) were within their right in requiring the Plaintiff to execute the release complained of by the plaintiff upon receipt of the benefits which the Trustees determined him to be entitled to receive from the Plan upon his request therefore, or in the alternative that the Court will find and determine that the amount of benefits thus offered to the Plaintiff by the Trustees was in fact all he was or is entitled to receive with the exception of any benefits which may later become funded to his account as provided in the Plan as last amended.

**36.** ERISA § 502(a)(3)(B), 29 U.S.C. § 1132 (a)(3)(B), allows a civil action by a fiduciary to obtain "other appropriate equitable relief . . . ." A declaratory judgment is a species of equitable relief. Although the counterclaim is not phrased in such a way so as to describe the relief which was sought as being a declaratory judgment, the pleading satisfied the requirements of Fed.R.Civ.P. 8(a)(3).

provisions, the controversy which both the complaint and the counterclaim drew into question—involving vesting—is arguably a candidate for an award of attorney fees under section 502(g), 29 U.S.C. § 1132(g).

15. ERISA does not contain any standards to guide courts when awarding attorney fees. Instead, the matter is left to the discretion of the court. Of the few reported cases, those which provide reasons for awarding attorney fees under section 502(g) turn on the bad faith of the losing party, the ability of the offending party to satisfy an award of attorney fees, and the amount of benefit which the action has conferred as a whole on the pension fund. *See Eaves v. Penn*, 587 F.2d 453, 464–65 (10th Cir. 1978); *Hurn v. Retirement Fund Trust*, 460 F.Supp. 112, 114 (C.D.Cal.1978) (willfulness); *Huge v. Maximeadows Mining*, 459 F.Supp. 267, 270 (N.D.Ala.1978) (no reasons). None of the reasons discussed in these cases justify an award of attorney fees to the defendants.[37] As for the plaintiff's request for attorney fees "[a]n altogether sufficient support for the court's decision not to award attorney's fees under ERISA is that the attorney obtained no relief under the statute." *Fase v. Seafarers Welfare and Pension Plan*, 589 F.2d 112, 116 (2d Cir. 1978) (per Friendly, J.); *See Eaves v. Penn*, 587 F.2d 453, 464–65 (10th Cir. 1978) (construing § 502(g)).

### E. Judgment

16. Accordingly, it is the opinion of this Court that on the basis of the issues presented to the Court by this lawsuit Mr. Thomas is entitled to receive $14,512.17 from the money purchase pension plan. Costs are taxed against the plaintiff. Fed. R.Civ.P. 54(d). Each party is to bear their own attorney fees.

---

**37.** Section 4.08 of the 1974 money purchase plan specifically provides that the trustees shall be reimbursed by the trust fund for any reasonable expenses arising in connection with their duties, *including* attorney fees.