Gene RETTIG, et al., Appellants,

v.

## PENSION BENEFIT GUARANTY CORPORATION.

No. 84–5260.

United States Court of Appeals, District of Columbia Circuit.

Argued June 6, 1984.

Decided Sept. 11, 1984.

Mark A. Borenstein, Los Angeles, Cal., with whom Karen W. Ferguson and Stephen R. Bruce, Washington, D.C., were on brief, for appellants. Miles N. Ruthberg, Los Angeles, Cal., also entered an appearance for appellants.

Mitchell L. Strickler, Deputy Gen. Counsel, Pension Ben. Guar. Corp., Washington, D.C., with whom Renae R. Hubbard, Sp. Counsel, Pension Ben. Guar. Corp., Washington, D.C., was on brief, for appellee.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge.

■ Saverio Ramputi and Herta Rettig had each worked for over thirty-five years for their employer, Lidz Brothers, Inc., when the company went out of business in 1978. Because the company's pension plan had insufficient assets to cover their vested benefits, the plaintiffs along with other plan participants turned to the Pension Benefit Guaranty Corporation (PBGC) to guarantee coverage of the benefits under the plan termination insurance provision of Title IV of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1301–1390. The PBGC, however, determined that plaintiffs' benefits, although vested under the company plan, were not guaranteed under ERISA because they had vested as a result of an amendment to the plan made less than one year prior to plan termination. Under the PBGC rule implementing the phase-in provisions of ERISA, 29 U.S.C. § 1322(b), all such recent plan amendments were to be disregarded in determining what benefits the PBGC would guarantee. The PBGC thus disregarded the plan amendment at issue, which provided for vesting after ten years of service instead of only upon retirement, even though the amendment was itself mandatory under the minimum vesting standards of Title I of ERISA, 29 U.S.C. § 1053. Plaintiffs Ramputi and Rettig sued the PBGC in district court to secure their pensions. The district court held that the PBGC's rule and its application of that rule to ERISA-mandated vesting improvements were based on a reasonable construction of the statutory phase-in provision. We now reverse the district court on the application of the rule in this case on the ground that the PBGC's decision to phase-in mandatory vesting improvements does not reflect the results of a reasoned decisionmaking process calculated to accommodate the conflicting policies underlying ERISA.

## I. BACKGROUND

The question of statutory construction on which this case turns critically affects the nature of the protections afforded by ERISA to thousands of employees. Specifically, we are concerned with whether benefits to which participants are entitled under the minimum standards for pension plans set out in Title I are guaranteed under Title IV if the plan terminates. We therefore briefly review the relevant provisions of ERISA and the PBGC's implementing regulations; we then turn to the facts of this case.

### A. Titles I and IV of ERISA and the Phase-In Rule

A virtually unanimous Congress [1] enacted ERISA in order to encourage the establishment and growth of private pension plans and to protect the participants in those plans by mandating the adoption of fair and equitable plan provisions for vesting the participation, by requiring adequate funding, prudent financial management and full disclosure, and by creating a system of plan termination insurance administered by a new government agency, the

---

**1.** The final vote in the House was 407 in favor and 2 against; in the Senate, 85 in favor and none against.

PBGC.[2] ERISA is a "comprehensive and reticulated statute," *Nachman Corp v. PBGC*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), several provisions of which are directly involved in this case.

### 1. *Minimum Vesting Standards*

One of the serious shortcomings Congress identified in private pension plans was their failure to provide for vesting of accrued benefits before the time of actual retirement; employees like Mrs. Rettig and Mr. Ramputi with thirty, forty or more years of service were thus flatly denied a pension if their employment was terminated for any reason before reaching retirement age. In enacting ERISA, Congress sought to remedy this inequitable situation by requiring all ERISA-covered pension plans[3] to provide for pre-retirement vesting determined solely by years of service. Title I of ERISA provides three alternative minimum vesting standards; that selected for the Lidz plan, like most plans,[4] provides for one hundred percent vesting of accrued benefits after ten years of service.[5]

For plans in existence on January 1, 1974, these requirements became effective for plan years beginning after December 31, 1975, 29 U.S.C. § 1061(b)(2); for newer plans, the vesting requirements were immediately effective for plan years beginning any time after the date of enactment, September 2, 1974. 29 U.S.C. § 1061(a). In selecting these particular effective dates, it is important to note, Congress rejected the less generous provisions of the House bill, which had provided for a gradual phase-in of the vesting provisions over five years. According to one of the House conferees, "[t]his change was made because, after consideration, your conferees agreed that it was essential for the protection of covered employees that they be given the full protection of the vesting provisions on the effective date without any delay, particularly since the costs involved in financing such vesting are expected to be moderate." 120 Cong.Rec. 29199 (1974) (remarks of Rep. Ullman).

### 2. *Plan Termination Insurance*

Vesting and other plan improvements required by ERISA were not adequate, how-

---

**2.** Congress sought to remedy the predicament of thousands of employees whose expectations of adequate retirement income were destroyed by stingy pension plan provisions, bad management or inadequate funding. Senator Vance Hartke described the situation to his colleagues:

> In all too many cases the pension promise shrinks to this: "if you remain in good health and stay with the same company until you are sixty five years old, and if the company is still in business, and if your department has not been abolished, and if you haven't been laid off for too long a period, and if there's enough money in the fund, and if that money has been prudently managed, you will get a pension."

*Hearings Before the Senate Subcomm. on Private Pension Plans of Comm. on Finance,* 93d Cong., 1st Sess. 451 (1973) (statement of Sen. Hartke).

**3.** Prior to ERISA, there were certain requirements—in particular a requirement that plans not discriminate in favor of management—for pension plans to become "tax-qualified," or entitled to beneficial federal tax treatment. ERISA not only set much higher standards for pension plans, but largely eliminated the optional fea-

ture of prior law: although employers were not required to maintain a pension plan, virtually all plans maintained by private employers or employee organizations affecting commerce were required to meet the standards of ERISA, and most were required to participate in the plan termination insurance program. 29 U.S.C. § 1321.

**4.** Eighty-eight percent of all full-time workers in medium and large pension plans are covered by the "ten-year cliff" vesting standard of Title I, 29 U.S.C. § 1053(a)(2)(A). *See* Brief for Appellants at 19 n. 12 (citing Bureau of Labor Statistics, Employee Benefits in Medium and Large Firms, Table 42 (1982)).

**5.** In addition to the "ten-year cliff" standard under which 100% of accrued benefits are vested after ten years of service, the statute provides two more intricate alternatives: one formula provides for 25% vesting after five years, gradually increasing to 100% after 15 years, 29 U.S.C. § 1053(a)(2)(B); the other provides for 50% vesting after five years if the sum of age and years of service is at least 45, and gradually increases to 100% vesting after ten years if the sum of age and years of service is at least 55. 29 U.S.C. § 1053(a)(2)(C).

ever, to protect participants in plans that terminated with insufficient funds to cover vested benefits. Throughout the deliberations that culminated in the enactment of ERISA, Congress was inundated with tragic stories of pension plan failures in which thousands of employees saw the destruction of the small measure of retirement security they had built up through decades of forced savings and deferred compensation.[6] Congress responded to this recurring tragedy by passing, as a major feature of comprehensive pension reform, a program of plan termination insurance. Under Title IV of ERISA, repeatedly hailed by legislators as one of the linchpins of the Act,[7] the newly-created PBGC would guarantee the payment of non-forfeitable (or vested) benefits—up to a statutorily-prescribed maximum monthly amount.

■ Section 4022(a) of ERISA, as it stood at the time of the Lidz plan's termination,[8] provided that, "subject to the limitations contained in subsection (b) of this section, the [PGBC] shall guarantee the payment of all non-forfeitable benefits ... under the terms of a [terminated] plan ...." One of the limitations on coverage in subsection (b) provides that, "[e]xcept to the extent provided in paragraph (8)," benefits under plans in effect less than sixty months are to be disregarded, and that

any increase in the amount of benefits under a plan resulting from a plan amendment which was made, or became effective, whichever is later, within 60 months before the date on which the plan terminates shall be disregarded. ERISA § 4022(b)(1)(B), 29 U.S.C. § 1322(b)(1)(B). Paragraph (8) provides for the phase-in of such benefits at a rate of twenty percent or twenty dollars per month, whichever is greater, for each year the plan or the amendment has been in effect. ERISA § 4022(b)(8), 29 U.S.C. § 1322(b)(8). The purpose of Title IV's "phase-in provision" as we will describe the combined language of paragraphs (1) and (8) of section 4022(b), was to prevent abuse of the termination insurance program by plan administrators who might "balloon" benefits, and thus unfunded plan liabilities, in anticipation of termination.[9] The PGBC also contends that the provision was designed to ease the immediate financial burden on the PGBC and employers of the newly-instituted guarantee provisions of ERISA.

The precise contours of the phase-in provision, although foreshadowed in the House and Senate bills, were among the many details of Title IV hammered out in the conference committee. We will examine the corresponding provisions of the

---

6. Even in the final debates over the conference bill, congressmen related the histories of dozens of pension plan failures and the hundreds and thousands of victims among their constituents. *See, e.g.,* 120 Cong.Rec. 29194 (1974) (remarks of Rep. Biaggi), *reprinted in* III Legislative History of the Employee Retirement Income Security Act of 1974 at 4659 (1976) [hereinafter cited as "Leg. Hist."]; *id.* at 29195 (remarks of Rep. Thompson), *reprinted in* III Leg.Hist. 4665; *id.* at 29206 (remarks of Rep. Brademas), *reprinted in* III Leg.Hist. 4694; *id.* at 29213 (remarks of Rep. Ford), *reprinted in* III Leg.Hist. 4711; *id.* at 29934–35 (remarks of Sen. Javits), *reprinted in* III Leg.Hist. 4747.

7. *See* 120 Cong.Rec. 29195 (1974) (remarks of Rep. Thompson), *reprinted in* III Leg.Hist. 4665; *id.* at 29213 (remarks of Rep. Ford), *reprinted in* III Leg.Hist. 4712; *see also id.* at 29950 (remarks of Sen. Bentsen), *reprinted in* III Leg.Hist. 4792; *id.* at 29960 (remarks of Sen. Packwood), *reprinted in* III Leg.Hist. 4820.

8. As we explain, *infra* pp. 147–49, section 4022(a) of ERISA was amended in 1980 to make it clear that benefits that were nonforfeitable under the minimum vesting standards of Title I were guaranteed notwithstanding the plan's failure to comply with those standards. The original version governs this case. ERISA, Title IV, § 4022(a), 88 Stat. 1016 (1974) (current version at 29 U.S.C. § 1322(a)) [hereinafter cited as "ERISA, § 4022(a) (1974)"].

9. *See* S.Rep. No. 383, 93d Cong., 1st Sess. 82–83 (1974), U.S.Code Cong. & Admin.News 1974, p. 4639, *reprinted in* I Leg.Hist. 1150–51; 119 Cong.Rec. 30039 (1973), *reprinted in* II Leg. Hist. 1723 (remarks of Sen. Nelson). *See also* Memorandum Opinion, *Rettig v. PBGC,* Civ. No. 82–0517, slip op. at 14 (D.D.C. Jan. 25, 1984) [hereinafter cited as "Opinion"]; 41 Fed.Reg. 6194 (Feb. 11, 1976) (final rulemaking); Advisory Opinion of Kenneth L. Houck, PBGC Executive Director, dated March 15, 1976, App. 248–49.

House and Senate bills, as well as the Conference Committee's explanation of its resolution of differences between them, in some detail in our discussion of the issues.

### 3. *The PBGC's Phase-In Rule*

The PBGC proposed for comment a regulation implementing the phase-in limitation.[10] The proposed rule provided that all "benefits increases" would be subject to phase-in, and defined "benefits increases" to include not only increases in the amount of monthly benefits but also "any change in plan provisions which advances a participant's ... entitlement to a benefit, such as liberalized participation requirements or vesting schedules, reductions in the normal or early retirement age under a plan, and changes in the form of benefit payments."

Several labor unions, in their comments on the PBGC's proposed rule, objected strongly to the including of vesting, participation and other plan improvements that do not increase the amount of monthly benefits in the scope of the phase-in limitation.[11] They argued that the PBGC's rule entailed an unauthorized expansion of the narrow scope that Congress prescribed for the phase-in limitation. The comments pointed out that Congress deliberately used the phrase "amount of benefits" in the phase-in limitation instead of using potentially broader phrases such as "value of benefits" or "actuarial value of benefits" as it did elsewhere in the same section of the Act.[12]

The PBGC rejected these criticisms and promulgated the rule essentially as proposed. 29 C.F.R. § 2609.2. It did not ar-

gue that the statute mandated its broader reading, but that the policies of the phase-in provision and of ERISA supported its rule. The PBGC explained in the preamble to the final rule that the purpose of the phase-in rule was "to protect against undue increases in unfunded plan liabilities in anticipation of plan termination."[13] According to the PBGC, this purpose could be defeated by too narrow a definition, since an employer could "balloon" benefits in anticipation of termination through liberalized vesting, lowered retirement age or other means that did not increase the amount of monthly benefits. In addition, the PBGC contended that such a narrow phase-in rule for amendments to existing plans was inconsistent with the complete phase-in of new plans clearly provided in the statute: "[i]t would be inequitable to provide on [sic] immediate and full guarantee of the benefits to which the participant in the existing plan has just become entitled while not doing so for the participant in the new plan."[14]

Although the rule clearly applied to liberalized vesting schedules generally, neither the notice of rulemaking nor the final rule made any specific mention of the anticipated application of the rule to ERISA-mandated vesting improvements, in spite of the substantial issues of statutory construction and purpose implicated by such an application. Not surprisingly, therefore, none of the comments explicitly addressed this issue.[15] Nevertheless, the record indicates that this decision was a matter of acknowledged importance and considerable controversy within the PBGC.[16] It appears from

---

**10.** 40 Fed.Reg. 51373 (Nov. 4, 1975).

**11.** *See* Comments of Industrial Union Dept., AFL–CIO, App. 225; Comments of United Steelworkers of America, App. 230–32.

**12.** *See infra* pp. 142–143.

**13.** 41 Fed.Reg. 6194 (Feb. 11, 1976).

**14.** *Id.* We discuss this argument *infra* pp. 152–153.

**15.** One comment inquired whether the rule would operate to phase-in benefits vesting as a result of a plan amendment providing for earli-

er vesting under the vesting standards of ERISA. It concluded that it would not, under a correct reading of the Act and a possible reading of the rule, because such an amendment (and indeed *any* amendment solely advancing vesting) would not increase accrued benefits payable at retirement. Comment of Mudge, Rose, Guthrie & Alexander, App. 368–72.

**16.** *See* Memorandum from Matthew Lind to Robert Lagather, *et al.,* dated Jan. 2, 1976 [hereinafter cited as "Lind Memorandum"], App. 242; Memorandum from Jane Ceccarelli to Emerson Beier, dated Sept. 24, 1975 [hereinafter cited as "Ceccarelli Memorandum"], App. 257; Minutes

the record that the PBGC based its decision to phase in mandatory vesting improvements on two considerations: (1) the difficulty of distinguishing between mandatory vesting changes designed to comply with ERISA and voluntary vesting changes going beyond those requirements and posing some risk to "ballooning"; (2) the financial advantages of phasing in PBGC and employer liability for benefit improvements mandated by ERISA.[17] There was strong dissent within the PBGC over this decision. Phyllis Spielman, a member and later chairman of the PBGC Advisory Committee, wrote to the PBGC's Executive Director, Robert Nagle, to express her strong view that the phase-in of mandatory vesting improvements was contrary to the legislative purpose and history of ERISA and unrelated to the limited purpose of the phase-in limitation, which was to avoid the premeditated ballooning of guaranteed benefits in anticipation of termination.[18] Nagle himself viewed the phase-in of mandatory vesting improvements as "the single most misguided decision made by PBGC."[19] It was the application of this decision to the facts of this case that resulted in the denial of any guaranteed benefits to these plaintiffs.

## B. *The Lidz Plan*

On May 31, 1978, Lidz Brothers, Inc., a small but established importer and exporter of buttons, buckles and novelties in Manhattan's garment district, sold its assets and ceased operations. As of that date, ultimately designated by the PBGC as the official pension plan termination date,[20] Herta Rettig had worked for Lidz Brothers for over thirty-seven years; she would have been eligible for early retirement on her fifty-fifth birthday on June 18, 1978. Saverio Ramputi had been employed for over thirty-five years but was not eligible to retire for several more years.

On the date of termination, both Mrs. Rettig and Mr. Ramputi had vested rights to pension benefits under the terms of the Lidz Brothers' pension plan, which provided for vesting after ten years of service. Prior to 1977, the plan, which was unfortunately typical of many pre-ERISA plans, had provided for vesting only upon actual retirement; under the unamended plan, neither Mrs. Rettig nor Mr. Ramputi would have had any vested benefits despite their long years of service. The Lidz plan thus did not meet any of the three alternative minimum standards set out in Title I of ERISA. After ERISA was enacted, the administrators of the plan chose the first alternative: one hundred percent vesting after ten years of service. Although the minimum vesting standards became effective for the plan on June 1, 1976, the plan was formally amended only on July 8, 1977, and made effective retroactively to June 1, 1976. As of that date, Mrs. Rettig, Mr. Ramputi and their coworkers with more than ten years of service acquired vested rights to all pension benefits they had accrued.

The Lidz plan terminated on May 31, 1978, less than a year after the adoption of the new vesting provisions, with insufficient assets to cover the vested benefits accrued by plan participants. The participants in the Lidz plan therefore looked to the PBGC to guarantee the payment of benefits to which they were entitled under the plan termination insurance provisions

---

of Mtg. No. 20 of Advisory Comm. of PBGC, Oct. 7, 1975 [hereinafter cited as "Minutes of Mtg. No. 20"], App. 260.

**17.** *See* Lind Memorandum, App. 242; Ceccarelli Memorandum, App. 257; Minutes of Mtg. No. 20, App. 260.

**18.** Letter from Phyllis Spielman to Robert Nagle, dated Nov. 12, 1980, App. 264.

**19.** *See* Memorandum from Spielman to PBGC File, dated Dec. 1, 1980, App. 566 (notes from telephone conversation). This memorandum

also reflects Nagle's view that the alleged administrative difficulty of guaranteeing benefits under ERISA-mandated vesting changes was not a substantial problem, and that the PBGC decision was vulnerable to legal challenge.

**20.** We express no view as to the propriety of the PBGC's selection of this termination date, an issue that was not fully litigated in the district court. *See* Brief for Appellants at 24 n. 7.

of Title IV. After unfortunate and protracted delay, the plaintiffs were informed in February, 1982, that the PBGC would not guarantee any benefits for those employes whose benefits were vested but who had not yet retired as of the plan termination date. The PBGC determined that those employees had become vested only as a result of the July, 1977, plan amendment providing for pre-retirement vesting. Since that amendment was adopted less than one year before plan termination, the PBGC determined that it must be wholly disregarded in calculating guaranteed benefits under the phase-in provisions of ERISA, 29 U.S.C. § 1322(b), and the PBGC's rule implementing those provisions, 29 C.F.R. §§ 2621, and that plaintiffs were therefore not entitled to any guaranteed benefits.

Upon learning of this decision, the plaintiffs promptly filed suit against the PBGC in district court to obtain the guaranteed benefits to which they claimed entitlement under ERISA. They argued (1) that the PBGC acted in excess of its statutory authority, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(C), in promulgating the phase-in rule, which they contended was contrary to the language and legislative purpose of ERISA; (2) that the rule was arbitrary, capricious and not in accordance with law under the APA, 5 U.S.C. § 706(2)(A); and (3) that the PBGC, by failing to signal its intention to apply its proposed rule so as to phase in ERISA-mandated vesting improvements, did not give adequate public notice of the rule's meaning, as required under the APA, 5 U.S.C. § 706(2)(B).

The district court held that the PBGC had the general authority to pass regulations interpreting the scope of the phase-in provision.[21] It held further that the PBGC

regulation conflicted with neither the language nor the purpose of the phase-in provision, which the court determined was a "mechanical abuse-neutral mechanism" aimed at "the prevention of employer abuse of the insurance program." [22] Finally, the court found the notice of proposed rulemaking sufficiently informative to meet the standards of the APA.[23] The district court thus granted partial summary judgment for the PBGC. This appeal followed.[24]

## II. The Phase-In Rule and ERISA

The PBGC contends that its construction of the statute is at least permissible in light of the language and legislative history of ERISA, and that policy considerations consistent with the general purposes of ERISA justify its reading of the phase-in provision. Plaintiffs contend, however, that the PBGC rule is inconsistent with specific congressional intent as to the scope of the phase-in provision; alternatively, they argue that even if the specific language and legislative history fail to reveal a specific congressional intent, the PBGC's policy arguments run directly counter to the statutory grain, in light of the overshadowing congressional purpose to protect plan beneficiaries like those involved here.

### A. The Scope of Review

We are initially confronted with the familiar task of reviewing an agency's construction of the statute it is charged with implementing, a task which of course we undertake with due deference to the agency's congressional mandate and expertise. *See Chevron U.S.A. v. Natural Resources Defense Council*, —— U.S. ——, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As we understand the Supreme Court's most

---

**21.** *See* Opinion at 8.

**22.** *Id.* at 15.

**23.** *Id.* at 18. In particular, the court observed that "three comments ... substantially recognized the dramatic reach of the proposed [rule]." *Id.* We do not read those comments objecting to the phase-in of *any* vesting improvements, *see supra* note 11, as necessarily recog-

nizing the application of the proposed rule to plan improvements mandated by ERISA.

**24.** Although one of plaintiffs' five causes of action survived the order granting summary judgment, the district court granted plaintiffs' motion to certify the independent legal issue resolved by the January order for immediate appeal under Federal Rule 54(b). *Rettig v. PBGC*, Civ. No. 82–0517 (D.D.C. Apr. 18, 1984).

recent pronouncements in *Chevron,* our inquiry consists of two steps. First, we must determine whether Congress had a specific intent as to the meaning of a particular phrase or provision. *Id.* at ——, 104 S.Ct. at 2781. To do this, we analyze the language and legislative history of the provision. As the Court noted in *Chevron,* "[t]he judiciary is the final authority on issue of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at —— n. 9, 104 S.Ct. at 2782 n. 9. Thus, in ascertaining the congressional intent underlying a specific provision, we are not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history.

However, if that inquiry fails to answer the precise question before us—if it appears that "Congress did not actually have an intent" regarding the particular question at issue, *id.* at ——, 104 S.Ct. at 2783 —then we must seriously consider whether Congress implicitly delegated to the agency the task of filling the statutory gap. At this second stage, when policy considerations assume a prominent role, we must uphold the agency's interpretation if it "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *Id.* (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). In this case, if we conclude that "Congress did not actually have an intent" with respect to the phase-in of mandatory vesting improvements, we are required to grant a considerable degree of deference to the PBGC's reconciliation of competing statutory policies. *Nachman Corp. v. PBGC,* 446 U.S. 359, 373–74, 100 S.Ct. 1723, 1732–33, 64 L.Ed.2d 354 (1980); *Belland v. PBGC,* 726 F.2d 839, 843 (D.C.Cir. 1984); *Connolly v. PBGC,* 581 F.2d 729, 730 (9th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

At the outset, we observe that the question of statutory interpretation before us is central to the nature of the protections afforded by ERISA. Throughout its deliberations over pension reform, Congress expressed particular concern over two critical weaknesses in private pension plans— weaknesses that ERISA's sponsors sought to correct. First, many plans had provisions so restrictive in terms of vesting, participation, accrual and other respects that only a fraction of the employees participating in the plan ever became entitled to any pension benefits; Congress repeatedly condemned plans that provided for vesting only upon actual retirement, regardless of the years of service. Second, too many plans terminated with insufficient assets to pay the benefits to which participants were entitled, leaving longtime employees totally bereft of pension protection in their final years. In response to these pervasive inequities, Congress enacted Title I to mandate the institution of minimum vesting rights in pension plans and Title IV to provide insurance against loss of benefits for participants in terminated plans. The PBGC's interpretation of the phase-in limitation, however, denies insurance protection to many participants in plans that suffer from both of these weaknesses. For example, employees with several decades of service are guaranteed no benefits whatsoever under a terminated plan that, until amended within the preceding year to comply with ERISA, had provided for vesting only upon actual retirement. As in this case, the PBGC rule results in the ERISA-mandated vesting provision being disregarded in favor of the now-outlawed and repealed pre-ERISA vesting provision. In sum, according to the PBGC, the minimum vesting provisions of Title I did not provide full protection for participants in terminated plans, an important class of ERISA's beneficiaries, until at least 1981, more than seven years after the statute's enactment.[25]

---

**25.** Assuming that most plans were amended only for plan years beginning after December 31, 1975, when required to do so by ERISA, the

five-year phase-in period was not complete until 1981.

Thus, the "technical" question of whether ERISA-mandated plan improvements are subject to the phase-in limitation is actually critical to the realization of some of the central policy goals of ERISA. On the other hand, the problem is also a "transitional" one. For plans terminating after 1981, when all plans that complied with the law would have had the minimum vesting standards in place for at least five years, mandatory vesting improvements would be fully effective notwithstanding the PBGC's interpretation of the phase-in provision. The question before us, then, is how quickly Congress intended to extend the full protection of the minimum vesting standards to participants in terminated plans.

## B. *Congressional Intent*

Plaintiffs argue that the PBGC's decision to subject mandatory vesting improvements to phase-in is inconsistent with the statutory phase-in provisions in two separate ways. First, plaintiffs read the phrase "increase in the amount of benefits" to refer only to increases in the amount of monthly benefits and not to other kinds of improvements, such as those that advance the timetable of a participant's entitlement to benefits. Second, plaintiffs argue that, even accepting the PBGC's interpretation of "increase in the amount of benefits" to include benefits under an amendment improving vesting, an ERISA-mandated vesting improvement does not "result[ ] from a plan amendment" but rather from ERISA itself.

### 1. *Language*

(a) *"Increase in the amount of benefits".* The plaintiffs argue that the PBGC phase-in rule is invalid because it impermissibly expanded the scope of the statutory phase-in limitation beyond that intended by

the phrase "increase in the *amount of benefits*" (emphasis added). They read the phrase literally to connote only increases in the level of monthly benefits to which a vested participant is entitled and not vesting or other improvements defining the conditions for participation or vesting and thus expanding the class of persons entitled to participate or receive benefits. The plaintiffs' interpretation of the phrase "increase in the amount of benefits" draws some support from the structure of the regulatory scheme created by ERISA. Title I imposes minimum standards for vesting, participation, accrual of benefits and funding, but nothing in ERISA requires an employer to have a pension plan or, if it has one, to provide for any particular level of benefits. There is, accordingly, a certain logic to designing a phase-in limitation that applies only to new plans or to increases in the level or amount of monthly benefits—matters as to which Title I imposes no requirements.

Plaintiffs' narrow interpretation of the phrase "amount of benefits" finds additional support in Congress' choice of a similar phrase—"amount of monthly benefits"—in the same section to prescribe a ceiling on the level of monthly benefits insured. 29 U.S.C. § 1322(b)(3). Plaintiffs point out that Congress used the potentially broader phrase "value of benefits" in other provisions of the statute,[26] and that its choice of a narrower term in a provision limiting benefits could well have been deliberate. The PBGC rejects plaintiffs' attempt to assign such a precise and narrow meaning to this phrase.[27]

We think there are persuasive arguments that the statutory language comfortably accommodates the plaintiffs' reading. However, we need not determine whether Congress authorized only the phase-in of

---

**26.** *See, e.g.,* 29 U.S.C. §§ 1322(b)(4)(A), (b)(5).

**27.** The PBGC points to several comments by legislators explaining the phase-in limitation in language that it contends is consistent with its own broader reading. *See, e.g.,* 120 Cong.Rec. 29931 (1974) (remarks of Sen. Williams) (phase-in applies "[w]here the benefits result from a plan provision" in effect less than five years),

*reprinted in* III Leg.Hist. 4741; *id.* at 29946 (remarks of Sen. Long) (phase-in applies "[w]here the plan provision providing the benefit" had been in effect less than five years), *reprinted in* III Leg.Hist. 4781; *id.* at 29200 (remarks of Rep. Ullman) (same), *reprinted in* III Leg.Hist. 4678.

increases in the amount of monthly benefits; the plaintiffs argue that whether or not the phase-in limitation can be construed to cover voluntary vesting improvements, which may pose a risk of abuse by employers anticipating termination, it cannot reasonably be construed to cover vesting improvements mandated by Title I of ERISA itself, which cannot possibly be subject to employer abuse.

(b) *"Resulting from a plan amendment."* Plaintiffs point first to the language of the phase-in limitation referring to increases "resulting from a plan amendment." According to plaintiffs, their entitlement to benefits that Title I requires to be vested results from ERISA, not from the July, 1977, plan amendment. According to this reading, plaintiffs might well have been entitled to guaranteed benefits even if their plan had not been amended prior to plan termination.

The phrase "resulting from a plan amendment" could be read to signify merely that an increase in pension benefits resulting solely from an increase in the participant's salary or an advancement in age or years of service are not included in phase-in.[28] The PBGC itself concedes, however, that the phrase, and indeed the language of the phase-in provision as a whole, could also accommodate the plaintiffs' narrow reading precluding the PBGC's decision to limit a participant's entitlement to benefits arising under provisions mandated by ERISA. Before turning to the legislative history, we must consider whether this reading of the phase-in provision is consistent with the remaining language of section 1322.

(c) *"Nonforfeitable ... under the terms of the plan."* Plaintiffs' benefits are guaranteeable only if they were "nonforfeitable under the terms of the plan" on the termination date.[29] Plaintiffs' view—that entitlement to benefits arising from ERISA-mandated vesting standards is not an "increase in the amount of benefits under a plan resulting from a plan amendment"—is consistent with several plausible interpretations of this provision. Congress perhaps assumed, as it rightly could, that plans would comply with ERISA on a timely basis. If all plans complied with the minimum vesting standards, then "the terms of the plan" with respect to vesting would be at least as generous as those standards. Even if Congress anticipated the problem of unamended or late-amended plans, it might have intended that the minimum vesting standards be read into the nonconforming plan, thus becoming legally implied "terms of the plan."[30] Either view is entirely consistent with plaintiffs' argument that their entitlement to benefits results from ERISA, not from a plan amendment. It is also possible, however, that Congress intended by this language to provide only for the guarantee of benefits vested under the express terms of the plan, even if those terms were unlawful under Title I of ERISA. If that were Congress' intent, then plaintiffs' position that their entitlement to benefits does not result from a plan amendment is somewhat more difficult to maintain.

In sum, although the language of these provisions is certainly hospitable to plaintiffs' interpretation, we cannot determine from the language alone whether or not Congress intended to limit the guarantee of benefits vesting under ERISA-mandated amendments by including them within the provision phasing in "any increase in the

---

**28.** The PBGC made this distinction in its rule defining "benefits increases" subject to phase-in. 29 C.F.R. § 2609.2.

**29.** As discussed below, this provision was amended in 1980 to provide clearly for the guarantee of benefits that Title I required to be vested under the terms of the plan. *See infra* pp. 148–49. This amendment was not made retroactive, however, and does not apply to this plan.

**30.** Under this view, the 1980 amendments were intended to clarify congressional intent and overrule an erroneous interpretation of the law by the PBGC. This interpretation of the statute and the purpose of the 1980 amendments, while plausible, is not an issue we must decide in this case.

amount of benefits ... resulting from a plan amendment." We must therefore turn to the legislative history for guidance as to what Congress intended with respect to those benefits.

### 2. *Legislative History*

The provisions of section 4022 of ERISA, 29 U.S.C. § 1322, that concern us here were among the numerous details of ERISA that were hammered out in the conference committee. At the outset of our inquiry, we note that we cannot necessarily indulge the usual presumption that the final bill represents a compromise—a middle position—between the two predecessor bills. Members of the conference committee and others reported to their colleagues in each house that "[t]he conference bill provides for the establishment of a system of plan termination insurance which is superior to the comparable provisions in either the House or the Senate bill." 120 Cong.Rec. 29200 (1974) (remarks of Rep. Ullman); *accord, id.* at 29946 (remarks of Sen. Humphrey).[31]

(a) *The predecessor bills.* The House bill had provided for the guarantee of "any rights under the plan in a regular retirement benefit ... which are nonforfeitable ... according to the [minimum vesting standards of the bill] in effect for such plan on such termination date." [32] The bill limited the guarantee of new plans and new benefits, however, as follows: the bill required that the plan have been a member of the guarantee corporation for at least five years (unless the corporation chose to guarantee payments earlier as to plans *in existence* for five years). The bill required in any event that, to be guaranteed, "such rights were created by plan amendment which was adopted and which took effect more than five years" prior to termination.[33]

The Senate bill provided for the guarantee of "all nonforfeitable benefits and of all ancillary benefits under the terms of a [covered] plan which terminates." [34] The bill also limited the guarantee of new plans and benefits by providing that no benefits under a plan in effect less than three years were to be guaranteed, and that "the amount of [guaranteed] benefits ... shall be determined without regard to any amendment of the plan which increases the value of benefits payable with respect to a participant, if such amendment was made" less than three years prior to termination.[35]

The House bill thus set the minimum vesting standards of the bill as both a floor and a ceiling on the basic definition of benefits guaranteed. However, by requiring that a plan be a member of the corporation for five years prior to termination, the bill would have postponed all mandatory protection for participants in terminated plans for five years. Furthermore, the bill's requirement that any right, to be guaranteed, must have been created by plan amendment in effect at least five years would seem to encompass amendments incorporating the minimum vesting standards. It seems likely then that under the House bill, if a plan was amended to comply with the minimum vesting standards, benefits thus required to be vested would be guaranteed only if the amendment had been adopted and put into effect more than five years prior to termination.

The structure and language of the Senate bill is quite different and more closely resembles the final version that concerns us here. The Senate bill, like ERISA, de-

---

31. For example, the House bill would have guaranteed benefits only for plans that had been members of the corporation for five years at the time of termination; the Senate bill had provided for coverage of plan years beginning after December 31, 1976. The final bill was more generous than either version; it provided for the retroactive guarantee of benefits under plans *terminating* after June 30, 1974, over two months prior to enactment.

32. H.R. 2, 93d Cong., 2d Sess. § 409(b)(1), *reprinted in* III Leg.Hist. 3898, 4024.

33. *Id.* at §§ 409(d)(2), (d)(3), *reprinted in* III Leg.Hist. 4026–27.

34. H.R. 2, 93d Cong., 2d Sess. § 422(a), *reprinted in* III Leg.Hist. 3599, 3702.

35. *Id.* § 422(b)(2), *reprinted in* III Leg. Hist. at 3703.

fined the scope of the guarantee by the terms of the plan. In both, the minimum vesting standards would set a floor on guaranteed benefits, but not a ceiling, upon going into effect.[36] The Senate bill also resembled ERISA in the manner in which it limited the guarantee of new plans and benefits. First, it wholly denied coverage only to plans that had been *created* less than three years prior to termination, regardless of how long they had been covered by the new insurance program. Similarly, ERISA denied coverage to plans in effect less than one year and phased in coverage of plans in effect less than one year and phased in coverage of plans in effect for one to five years.

Finally, the Senate bill's limitation on the guarantee of new benefits under existing plans resembles the final provisions. Instead of setting out a broadly worded prerequisite for guaranteed rights, as the House bill did, the Senate bill contained a narrowly worded exception to guaranteed coverage. The exception applies to "any amendment of the plan which increases the value of benefits payable with respect to a participant," while the final version applies to "any increase in the amount of benefits under a plan resulting from a plan amendment." Unfortunately, we cannot discern in the language of the Senate bill, any more than in the language of ERISA itself, a clear intent either to include or to exclude amendments—in particular mandatory amendments—improving vesting.

We must be cautious in any event in reading too many nuances into the exact wording of the House and Senate bills, for it is not clear that the legislators attached such precise meaning to the differences. For example, a summary of the two bills by the Congressional Research Service reprinted in the Congressional Record prior to conference described the two parallel provisions in virtually identical language as not providing for the guarantee of "benefits resulting from a[ny] plan amendment" in effect less than the specified number of years.[37] All we can conclude from the language of the predecessor bills is that Congress appears not to have written this language with ERISA-mandated amendments clearly in mind. The language in these two bills, especially in the Senate provisions whose structure and language more directly parallels the phase-in provision of the final bill, does not clearly contemplate either the inclusion or exclusion of benefits vesting under recent ERISA-mandated amendments in the limitation on guaranteed benefits applicable to recent plan amendments.

We cannot agree, however, with the PBGC that these bills both had provisions that would have limited the guarantee of benefits arising from ERISA-mandated vesting provisions. The district court's acceptance of that argument appears to have been based largely on its reading of a passage from the Conference Report summarizing the conferees' resolution of the numerous technical differences between the two bills.[38] We turn therefore to that critical passage.

(b) *The Conference Report.* The following passage from the conference report, which both parties regard as illuminating,

---

**36.** The bill, like ERISA as passed, required all plans in existence on the date of enactment to comply with the minimum vesting standards in plan years beginning after December 31, 1975. *Id.* at § 411(f), *reprinted in* III Leg.Hist. 3633. Since the bill provided for guarantee of benefits under plans terminating in plan years beginning after December 31, 1976, one year after the vesting standards were to become effective, the terms of the plan would presumably provide for vesting at least as generous as the law required. The minimum standards would thus set a floor but not a ceiling. Under ERISA as passed, the insurance protection was instituted on an accelerated basis, covering even plans terminating up to two months before enactment and well before Title I standards went into effect. ERISA § 4082, 29 U.S.C. § 1382. As a result, the terms of a plan terminating before the minimum vesting standards went into effect might be less generous than those standards required.

**37.** Comparison of Senate-Passed and House-Passed Versions of H.R. 2, 120 Cong.Rec. 8855 (1974), *reprinted in* III Leg.Hist. 4259. *See also supra* note 27.

**38.** Opinion at 12.

explains the committee's resolution of several differences between the House and Senate bills as to what benefits were to be guaranteed:

The House bill would provide coverage for benefits required to be vested under the bill's minimum vesting standards (up to the insurance limitations) if the plan providing the benefit had been covered for more than five years prior to the termination. The corporation could elect to cover (subject to certain conditions) nonbasic benefits if both the plans providing them and the plan provisions providing the particular benefits had been in existence for more than five years prior to the termination, or if the plans providing the coverage were tax-qualified. The Senate amendment provided coverage for benefits vested under the plan up to the insurance limitations and without regard to whether they exceeded the vesting required under the bill. The benefits, however, had to have been provided by plan provisions in effect at least three years prior to the termination.

Under the conference substitute, vested retirement benefits guaranteed by the plan (other than benefits vesting only because of the termination) are to be covered to the extent of the insurance limitations exception to the extent indicated below....

One of the principal limitations on the coverage is that it is to be phased in at the rate of 20 percent per year until the plan or benefit is fully covered after it has been in effect for five years.[39]

The PBGC contends that this passage from the conference report demonstrates that Congress decided to phase-in all plan improvements, including vesting improvements. The district court "reluctantly agree[d] with the PBGC" that the suggestion of the conference report that vested retirement benefits were to be subject to phase-in also meant that the provision giving rise to vesting was to be subject to phase-in.[40] We cannot agree with this reading of the Conference Report.

There is no dispute that "vested benefits guaranteed by the plan" are subject to phase-in; under the Act as originally passed, only benefits vested under the terms of the plan were to be guaranteed by ERISA in the first place. ERISA, § 4022(a) (1974). A recent plan amendment that increased the amount of monthly benefits to which vested participants were entitled would obviously be subject to phase-in. But that does not mean that phase-in applies to plan provisions defining the point at which vesting occurs.

As to mandatory vesting provisions, the PBGC argues that it is clear from this passage that Congress considered guaranteeing benefits "required to be vested under the ... minimum vesting standards" but decided instead to cover only the benefits vested under the plan itself, *and* to phase-in all amendments, mandatory or otherwise, improving benefits under the plan. In light of our analysis of the two bills before the committee, however, we think that a more plausible interpretation of this passage suggests quite the opposite.

We have concluded that both the House bill and the Senate bill provided insurance coverage for benefits *required to be vested* under the minimum vesting standards, but that the Senate bill also covered benefits under the plan "without regard to whether they *exceeded* the vesting required under the bill." Neither of the two bills appears to have contemplated coverage *less* generous than that required by the minimum vesting standards. The conference committee adopted the less restrictive Senate version, which guaranteed benefits vested under provisions *more* generous than required under the minimum vesting standards. As we read this passage, it suggests that Congress intended, in writing section 4022(a) as it did, to provide for the guarantee of at least those benefits that Title I required to be vested.

---

**39.** H.R.Rep. No. 1280, 93d Cong., 2d Sess. 368 (1974), U.S.Code Cong. & Admin.News 1978, pp. 5147–5148, *reprinted in* III Leg.Hist. 4277, 4635.

**40.** Opinion at 16.

However, the passage does not appear to address the application of the phase-in provisions of section 4022(b) to mandatory vesting amendments. This "transitional" problem that arose in the first seven years of administering ERISA does not seem to have been among the issues Congress attempted to resolve or explain in the Conference Report.

(c) *Other legislative history.* There is some evidence in the legislative history that Congress intended that Title I standards be promptly and fully effective in all contexts, including that of plan termination. We have already noted that Congress chose to make Title I effective on an expedited basis. Congress deemed it "essential for the protection of covered employees that they be given the full protection of the vesting provisions of the effective date without any delay." *See supra* p. 136. Further evidence indicates that "the full protection of the vesting provisions" extended to the guarantee of benefits under terminated plans.

During the final debates preceding the overwhelming passage of ERISA, an article inserted into the record by two senators—including one member of the conference committee—and described by them as an excellent summary of the provisions of ERISA indicated that the minimum vesting requirements of Title I would rapidly take effect to protect participants in terminated plans:

> Question: What good is the insurance of vested benefits to older employees of companies that have provided little or no vesting of pension credits?
>
> Answer: A great deal of good, because the minimum vesting requirements written into the law are to put a floor under insured benefits.
>
> Thus, authors of the legislation say, a worker with 15 years of service in a company can rest assured that, in nearly all cases, his pension is safe.[41]

The suggestion that Title I standards were intended to provide a floor for guaranteed benefits is entirely consistent with the evidence reviewed thus far. Congress either anticipated that plans would promptly comply with Title I, incorporating those minimum standards into the express terms of a plan, or it anticipated that those minimum standards would be legally implied into the terms of non-complying plans. In either case we have serious reservations as to whether entitlement to benefits under ERISA-mandated vesting provisions was deemed an "increase in the amount of benefits resulting from a plan amendment" subject to phase-in. The phase-in of those benefits, while not explicitly addressed by the passage, clashes sharply with the general assurance of prompt and complete protection of long-term employees conveyed by the passage.

(d) *The 1980 amendments.* Prior to 1980, participants in plans that terminated without being amended to comply with Title I were not guaranteed benefits because the PBGC read section 4022(a) of ERISA, which provided only for the guarantee of benefits that were "nonforfeitable ... under the terms of the plan," to preclude the guarantee of those benefits. Notice of the PBGC's failure to guarantee benefits required to be vested under Title I was met with apparent surprise in Congress—surprise either at the PBGC's construction of ERISA or at the fact that many plans, unlike the Lidz plan, had failed to amend in conformity with ERISA. In 1980, Congress therefore amended section 4022(a) to delete the phrase "under the terms of the plan" and added a definition of "nonforfeitable benefits" guaranteeable under section 4022(a) as those "for which a participant has satisfied the conditions for entitlement under the plan *or the requirements of this Act.*" Multiemployer Pension Plan Amendments Act of 1980, § 402(a)(1)(E), 29 U.S.C. § 1301(a)(8) (emphasis added). Thus, for plans terminating after September 26, 1980, the date those amendments were enacted, Congress appears to have anticipated that "PBGC regulations will

**41.** 120 Cong.Rec. 29955 (1974) (in remarks of Sen. Nelson), *reprinted in* III Leg.Hist. 4808; *id.* at 29958–59 (in remarks of Sen. Ribicoff), *reprinted in* III Leg.Hist. 4817.

treat a plan as having been amended on the date that ... ERISA provided that the relevant provisions of title I first applied to the plan." 126 Cong.Rec. 23288 (1980) (statement of Sen. Williams).[42]

The brief legislative history of the 1980 amendments reinforces the view that, whether or not Congress originally intended the coverage of benefits under unamended plans, it did not intend the phase-in of mandatory vesting improvements that were properly adopted. Senator Williams, who had been a key sponsor of ERISA, explained to his colleagues the need for the amendment:

It has been brought to our attention that a significant number of pension plans—perhaps as many as 25,000—have never been amended to conform with the requirements of title I of ERISA. This is particularly disturbing because title I contains a number of requirements relating to minimum vesting and participation standards, mandatory joint and survivor annuities, and so forth, that provide crucial protection to plan participants.

Under current law, the PBGC guarantees pension benefits that are nonforfeitable under the plan. As a result, if a plan administrator ... has not amended a plan to comply with ERISA, the PBGC is unable to guarantee the benefits to which a participant is entitled under the standards established by title I of ERISA. In effect, innocent participants are paying the price when their employers disregarded the law.

We believe that when a nonamended plan terminates, the PBGC should guarantee those benefits to which the partici-

pant would have been entitled if the plan had conformed to the essential requirements of title I, subtitle B, part 2. Accordingly, the bill amends current law to delete the requirement that the PBGC may only guarantee benefits that are nonforfeitable under the terms of plan. Under the bill, the PBGC has authority to guarantee benefits for which the participants have satisfied the appropriate requirements of title I of ERISA.... Thus, the appropriate plan amendments will be deemed to have been effective on the date provided in section 211. This provision applies to plans that terminate after the date of enactment of the bill.

126 Cong.Rec. 23288 (1980). Senator Williams appears to have assumed that if a plan administrator *had* amended a plan before termination to comply with ERISA, as did the Lidz plan trustees, the PBGC *would* guarantee the benefits thereby made nonforfeitable. The lack of any reference to the phase-in limitation strongly suggests to us that even in 1980 Congress was not aware of, and did not approve, the position taken by the PBGC that such amendments—in effect, the minimum vesting standards of Title I—were to be phased-in. The record in this case indicates that Senator Williams himself wrote to the PBGC shortly after the 1980 amendments were enacted to inquire about and protest the PBGC's phase-in of mandatory vesting improvements as inconsistent with ERISA.

■ In the House, the only explanation of the 1980 amendment was by Representative Thompson, who had also been a key

---

**42.** The PBGC argues that the reference to an implied effective date for the implied plan amendments makes sense only if Congress knew and implicitly approved of the application of phase-in to mandatory vesting amendments. Notwithstanding the absence of any reference in the legislative history of the 1980 amendments to phase-in, the PBGC argues that no effective date for those implied amendments would be required except to mark the beginning of the five-year phase-in. But there are any number of situations in which the effective date of a legally-implied plan amendment would be significant. For example, participants who had previously been terminated prior to vesting under the terms of an unamended plan may conceivably have a claim against the plan trustees or the PBGC if they were terminated after the effective date of the legally-implied amendment conforming the plan to the requirements of Title I. We do not know what prompted Senator Williams' observation about treating plans as having been amended on the date Title I was effective for the plan. But there is no evidence that he or any other member of Congress had in mind the application of the phase-in limitation to those implied amendments.

sponsor of ERISA in 1974. According to Representative Thompson:

The bill makes clear that in the case of plans terminating or requiring financial assistance from PBGC after enactment, PBGC's guarantees will extend not only to nonforfeitable benefits provided under the terms of the plan, but also to those nonforfeitable benefits to which participants are entitled under the requirements of title I of ERISA. This will protect participants in those instances, which still exist, where a plan has never been amended to conform to the requirements of title I. Despite the failure to amend such plans, their participants have been entitled to the benefits mandated by title I since those requirements became applicable, and they should be protected by PBGC's guarantees just as if those provisions had been written into their plan on their effective date. PBGC's regulations may provide a practicable basis for determining guaranteed benefits in those cases where plans would have an option with respect to title I compliance—such as a choice among vesting schedules—but failed to adopt amendments exercising that option.

126 Cong.Rec. 23,041 (1980). This explanation of the need for the 1980 amendment assumes, as did Senator Williams' statement, that plan participants were "entitled to the benefits mandated by title I since those requirements became applicable," and that if a plan had been timely amended to comply with Title I before termination, the PBGC would have guaranteed those benefits. Once again, the lack of any reference to the phase-in provision, which sharply limited the PBGC's guarantee of the benefits to which participants were entitled under Title I, indicates to us that Congress was not aware of the PBGC's position in this regard. The legislative history of the 1980 amendments, though brief, provides persuasive evidence that Congress believed that ERISA had provided for the full guarantee under Title IV of benefits required to be vested under Title I, and properly vested under the express terms of the plan, as of the effective date of those vesting requirements.[43]

(e) *Court decisions.* Although no court has considered the precise issue before us, several decisions bolster the view that Congress envisioned the full guarantee of benefits under ERISA-mandated vesting provisions. First, the Supreme Court assumed in *Nachman v. PBGC,* 446 U.S. 359, 384, 100 S.Ct. 1723, 1730, 1737, 64 L.Ed.2d 354 (1980), albeit in dicta, that for a plan terminating after the effective date of the Title I vesting standards, those standards would automatically make the PBGC liable for the coverage of those additional benefits thus required to be vested.[44] Second,

---

**43.** We recognize that the view of a subsequent Congress is not controlling evidence of the intent of an earlier Congress. *See, e.g., Universities Research Ass'n v. Coutu,* 450 U.S. 754, 778, 101 S.Ct. 1451, 1465, 67 L.Ed.2d 662 (1981); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2060–61, 64 L.Ed.2d 766 (1980). However, such evidence can legitimately be used for its persuasive value. *See e.g., Bell v. New Jersey and Pennsylvania,* 461 U.S. 773, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 313 (1983); *Andrus v. Shell Oil Co.,* 446 U.S. 657, 668–72, 100 S.Ct. 1932, 1939–41, 64 L.Ed.2d 593 (1980); *Office of Communications of United Church of Christ v. FCC,* 707 F.2d 1413, 1429 n. 48 (D.C.Cir.1983); *Kalaris v. Donovan,* 697 F.2d 376, 392 n. 65 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). In this case the evidence of subsequent congressional interpretation is consistent with evidence of the intent of the enacting Congress.

**44.** The precise question before the Court was the definition of "nonforfeitable" benefits guaranteed by the PBGC and thus recoverable from employers. The employer argued that a disclaimer clause—a standard clause disclaiming any direct employer liability for vested benefits for which plan funds were inadequate—made all benefits forfeitable and thus not guaranteed. The Court agreed with the PBGC, however, that "nonforfeitable" benefits were vested benefits, and that a disclaimer clause did not therefore operate to make all benefits forfeitable. In the course of the analysis supporting this construction of the statute, the Court reviewed the structure of the effective dates by which Congress provided gradually for the full implementation of the Act and concluded that the company's interpretation of the Act was illogical in the context of those effective dates. The Court read the Act as providing for four phases, the final and fully effective phase beginning on January 1, 1976, the effective date of the minimum stan-

outside the context of plan termination, several courts have interpreted Title I to invalidate and effectively amend nonconforming vesting provisions by operation of law.[45] These decisions suggest that the benefits to which employees are entitled under Title I result directly from ERISA and were not intended to be subject to the phase-in limitation.

We need not, however, decide in this case whether the PBGC's phase-in rule is valid on its face—*i.e.*, whether the statute may be construed to require the phase-in of voluntary vesting and other improvements not increasing the amount of monthly benefits payable to one entitled to receive benefits. That case is not before us. Nor need we decide whether the original provisions of the statute required the coverage of benefits that Title I but not the express terms of the plan required to be vested. We think that the language and the legislative history of both the original Act and the 1980 amendments suggest that Congress did not anticipate and provide for the problem, which is similarly not before us, of plans that failed to comply with ERISA before the time of termination. We consider simply whether the PBGC's refusal to guarantee benefits that are nonforfeitable under the terms of the plan mandated by the minimum vesting standards of ERISA is consistent with congressional intent.

We have been unable to find a single, concise statement anywhere in the statute or its legislative history as to whether or not the PBGC's obligation to guarantee benefits under plan amendments mandated by Title I is subject to the limitations of the phase-in provision. Yet we emerge from our foray into the statute and its history with the indubitable impression that Congress intended that the PBGC fully guarantee benefits to those employees meeting the vesting standards whose incorporation into pension plans Congress deemed so essential to its program of pension reform. Notwithstanding this strong impression, our inquiry is not at an end. Although we think it is considerably more likely than not that Congress envisioned the immediate and full guarantee of benefits that ERISA itself required to be vested, we are unable to characterize as entirely clear and unambiguous the evidence reviewed here of the intent of Congress as to the precise question before us. We must therefore proceed to the second stage of our task of statutory construction, and determine whether the PBGC's interpretation of the statute reflects "a reasonable accommodation of conflicting policies ... committed to the agency's care by the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* —U.S. —, —, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984) (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

### C. *Policy Considerations*

As with our inquiry into the precise intent of Congress, our inquiry into the reasonableness of the PBGC's policy concerns two related issues: whether it was reasonable for the PBGC to provide for the phase-in of vesting improvements generally and,

---

dards for Title I, and the day after the petitioner's plan terminated:

> During the third period [ending December 31, 1975], the terms of the pension plan still measured the outer limits of the unfunded liability. Had petitioner waited another day [*i.e.*, until January 1, 1976] to terminate, Title I's vesting standards would have become effective, thereby increasing the number of employees whose benefits would have become vested ... and therefore insurable under Title IV.

446 U.S. at 384, 100 S.Ct. at 1737. The Court thus appeared to believe that, as of the effective date of the vesting provisions, those provisions overrode nonconforming terms of the plan.

**45.** *See, e.g., Duchow v. New York State Teamsters Conference Pension & Retirement Fund,* 691 F.2d 74, 77–80 (2d Cir.1982), *cert. denied,* 461 U.S. 918, 103 S.Ct. 1902, 77 L.Ed.2d 289 (1983) (implying into plan requirement of 29 U.S.C. § 1053(a) that rights vest at normal retirement age); *In re Defoe Shipbuilding Co.,* 639 F.2d 311, 314 (6th Cir.1981) (minimum vesting standards override contrary plan provisions); *Thomas v. Marshall,* 482 F.Supp. 160, 165 (S.D.Ala.1979) (minimum vesting requirements supercede terms of plan "as a matter of law"); *Nedrow v. McFarlane & Hays Co. Employees' Profit Sharing Plan & Trust,* 476 F.Supp. 934, 937 (E.D.Mich. 1979) (minimum vesting requirements read into plan where plan terms silent or contrary).

if so, whether it was reasonable to phase-in ERISA-mandated vesting improvements as well. The first question was explicitly addressed by the PBGC in the rulemaking proceeding resulting in the adoption of the phase-in rule, 29 C.F.R. 2609. The second question concerning the status of ERISA-mandated plan improvements was addressed only in internal memoranda that are part of the record and in the PBGC briefs to this court.

▬ In the absence of specific legislative intent, "the question for a court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* — U.S. at —, 104 S.Ct. at 2782 (footnote omitted). The Supreme Court's language in *Chevron* might be read to indicate that the appropriate standard of review in such a situation varies to some degree dependent on whether the statute's delegation of gap filling authority is explicit or implicit.

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or

manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Id.* at —, 104 S.Ct. at 2782. If the Court's language does envision two standards,[46] then the "reasonableness" standard applies to the agency action before us because Congress did not expressly delegate to the PBGC the authority to determine the insurability of ERISA-mandated plan amendments during the phase-in period.[47] In determining whether an agency's interpretation represents a reasonable accommodation of conflicting statutory purposes, a reviewing court must determine both whether the interpretation is arguably consistent with the underlying statutory scheme in a substantive sense and whether "the agency considered the matter in a detailed and reasoned fashion." *Chevron,* — U.S. at —, 104 S.Ct. at 2793 (footnote omitted).

As we have already indicated, PBGC's interpretation of ERISA, although not par-

---

**46.** We must admit to some doubts about such a distinction. If, as here, an implicit delegation is followed by agency informal rulemaking or other agency action, the arbitrary and capricious standard of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), would still seem to apply. The possible difference in standards is not critical here, however, because we do not believe the agency's rationale for the application of its rule to this set of facts would meet the APA standard either, *see Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983), and our analysis of the PBGC's action under the arbitrary and capricious standard would not differ in any material respect.

**47.** The PBGC's determination that the plaintiffs' benefits were not guaranteed constituted an informal agency action—an application of a pre-existing regulation to a largely unanticipated situation—rather than a rulemaking. The Supreme Court, however, has not indicated that the requirement of a "reasonable" statutory construction is different in the context of direct case application than in that of rulemaking. *Compare, e.g., Chevron,* — U.S. at —, 104

S.Ct. at 2783 (applying the reasonableness standard to a regulation) *and Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975) (same) *with INS v. Jong Ha Wang,* 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981) (per curiam) (applying the test to a specific application of a statutory standard). Courts have long required agencies to state their findings and reasons for informal decisions and applications of pre-existing rules regardless of whether the APA, 5 U.S.C. § 553 *et seq.,* or any other procedural statute technically applies to the agency's action. *See, e.g., SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action."); *Matlovich v. Secretary of the Air Force,* 591 F.2d 852, 856 (D.C.Cir.1978) ("[T]he absence of any reasoned explanations ... makes it impossible to decide whether or not there has been an abuse of discretion or whether improper factors have played a material role."); *Ace Motor Freight, Inc. v. ICC,* 557 F.2d 859 (D.C.Cir.1977); *see generally,* 3 K. Davis, Administrative Law Treatise § 14.24 (2d ed. 1980).

ticularly compelling, is not patently inconsistent with the statutory scheme. In determining whether the PBGC's interpretation of this statutory provision represents a reasonable accommodation of competing statutory policies, then, we must examine the arguments put forward by the agency and determine whether the PBGC acted with sufficient care and based its decision on a consideration of relevant factors. As the Court in *Chevron* emphasized with respect to the necessary inquiry into reasonableness, we must proceed with caution, endeavoring not to step beyond the bounds of our legitimate function by reweighing the policy already considered by the agency. If the agency recognized legitimate competing considerations and evaluated them conscientiously, we must not disturb its conclusion.

### 1. *Prevention of Employer Abuse*

The PBGC argues, as it did in promulgating its phase-in rule, that the basic purpose of the phase-in provision—to prevent employers from abusing the protections of ERISA by increasing unfunded plan terminations in anticipation of termination—would be easily circumvented by too narrow a construction. For example, the PBGC argues, an employer anticipating plan termination could amend its pension plan to provide for vesting of all benefits after only one year of service, thus sharply increasing the number of participants entitled to benefits that would be "nonforfeitable ... under the terms of the plan" and guaranteed by the PBGC.

■ The district court found that the basic purpose of the phase-in provision was indeed to prevent "ballooning" of benefits in anticipation of termination.[48] The PBGC has consistently taken this position, and we agree with this understanding of the purpose of phasing in recent plan amendments. We are, furthermore, persuaded that voluntary plan amendments—those that exceed the requirements of Title I—do implicate the possibility of employer abuse

of just the sort that the phase-in limitation was designed to thwart. It was thus reasonable, in light of the ambiguity of Congress' intent on this precise point, for the PBGC to construe the statutory phase-in limitation to extend to voluntary plan amendments that do not increase the dollar amount of monthly benefits under the plan.

However, the PBGC does not seriously argue that mandatory vesting amendments such as the one involved in this case present any risk of abuse. It would be absurd to suggest that employers could abuse the guarantee provisions of ERISA by making plan improvements required by Congress itself after years of deliberation over the weaknesses of private pension plans. Thus, while we uphold the PBGC's decision to phase in voluntary vesting amendments in general, and thus the PBGC's regulation implementing this decision, we do so on a basis that provides no support whatsoever for the phase-in of mandatory plan amendments. The additional policy arguments advanced by the PBGC in favor of its phase-in of plan improvements other than increased monthly benefits, to the extent they support the phase-in of voluntary plan improvements, provide no support for the phase-in of mandatory plan improvements.

### 2. *Unequal Treatment of New Plans and Newly-Vested Benefits*

In its final rulemaking, the PBGC contended that the phase-in of only increased monthly benefits "would result in inequality of treatment between participants in new plans and those in existing plans." According to the agency, "[i]t would be inequitable to provide on [sic] immediate and full guarantee of the benefits to which the participant in the existing plan has just become entitled while not doing so for the participant in the new plan."[49]

We seriously question the logic of this argument as applied to vesting improvements generally. It is clear to us that an

---

**48.** Opinion at 14. *See also supra* note 9.

**49.** 41 Fed.Reg. 6194 (1976).

employee who has participated in and contributed to a pension plan for many years has a much stronger and more reasonable expectation of eventually receiving benefits under the plan—even if the plan has had inadequate vesting provisions—than does an employee whose employer only recently instituted a pension plan. But whatever reservations we may have as to the validity of this argument with respect to vesting improvements generally, we believe it offers no support for the phase-in of mandatory vesting benefits. Congress saw fit to leave wholly unregulated the decision of whether to have a pension plan, yet it instituted strict requirements as to what provisions any such plan must include. This congressional decision recognizes the expectations that employees understandably develop on the basis of the mere existence of a pension plan, even apart from its technicalities. In light of that decision, it is certainly no unwarranted inequality of treatment to phase-in all benefits under new plans but to grant the immediate and full protection of the minimum vesting standards to employees under plans that have been in existence, and consequently have given rise to legitimate employee expectations, for many years.

The PBGC's two publicly articulated reasons for its broad phase-in of plan amendments improving benefits thus provide no support whatsoever for the application of that rule to the legally distinct and significant subset of plan amendments required by the minimum vesting standards of ERISA. It is evident that the phase-in of mandatory vesting improvements implicates not only unique issues of statutory construction, as we have seen, but also unique policy considerations. We now turn to the remaining policy arguments advanced by the PBGC in support of its decision.

### 3. *Unintended Influence on Structure of Plans*

The PBGC contends that including only amendments increasing monthly benefits in the phase-in limitation would create a financial incentive for employers to amend

their plans in that way rather than in other ways not covered by the limitation, thus influencing plan structures in a manner not intended by Congress. The PBGC argues as follows:

> Under Section 4062 of ERISA, 29 U.S.C. § 1362, an employer that maintained a terminated pension plan covered by Title IV would be liable to the PBGC for the amount by which a plan's assets were insufficient to provide guaranteed benefits. Thus, an employer's financial interest is served if the PBGC guarantees are limited. Recognizing this, an employer might well favor amendments improving plan benefits that are subject to phase-in rather than others perhaps more appropriate, that are not.

Brief for Appellee at 28. The PBGC argues that the plaintiffs' narrow construction would thus tend to affect the structure of pension plans in a manner not anticipated and not intended by Congress.

This argument not only seems somewhat far-fetched, but it is flatly inconsistent with the PBGC's argument, which we accept, that the purpose of preventing employer abuse supports the phase-in of all (voluntary) plan amendments improving benefits. That argument assumes that, given a narrow phase-in rule, employers facing plan termination would be tempted to "balloon" benefits in ways *not* covered by phase-in, thus increasing the extent of the PBGC's liability. The PBGC cannot logically maintain at the same time that a narrow phase-in rule would lead employers to provide new benefits in ways that *are* covered by phase-in so as to limit their potential liability.

Even if the argument were not irreconcilable with the PBGC's primary argument for a comprehensive phase-in rule, it would have no force as to mandatory plan amendments. An employer wishing to limit its financial exposure by preferring plan amendments subject to phase-in is nevertheless required by law to institute the minimum vesting standards of Title I. Exemption of those mandatory amendments from the phase-in rule could thus have no

effect not intended by Congress on the structure of pension plans.

### 4. Distinguishing Voluntary From Mandatory Plan Amendments

The PBGC argues that exempting mandatory vesting amendments from phase-in would require the PBGC to distinguish between mandatory improvements and voluntary improvements going beyond the requirements of Title I, a task made more difficult by the existence of three distinct minimum vesting standards. While this argument is not, like those discussed thus far, utterly without logical application to mandatory vesting improvements, neither is it an argument entitled to much weight. The minor administrative challenge posed by the need to identify and treat separately mandatory vesting changes would seem to be less taxing than that which the PBGC must undertake to implement the 1980 amendments, which require the PBGC to read the mandatory vesting standards into unamended plans.[50]

### 5. Phasing In Employer and PBGC Liability

■ The PBGC's only remaining argument is that its decision to phase in mandatory as well as voluntary amendments is a reasonable means of protecting the financial viability of the guarantee fund and gradually imposing employer liability for the new vesting provisions. We need not dwell long on the plaintiffs' argument that the PBGC may not consider its own financial interest as a basis for denying benefits.[51] It is clear to us, as it was to the district court, that "[g]radual implementa-

tion of PBGC liability obviously results in gradual phasing-in of employer liability."[52] The connection between the PBGC's financial status and the program's cost to employers is due first to the contingent liability provisions making an employer maintaining a terminated plan liable to the PBGC for any amount, up to thirty percent of its net worth, paid out for guaranteed benefits not adequately funded by the plan. In addition, the insurance program is self-financing; as the PBGC's costs rise, so do employer premiums. As we have previously noted in Belland v. PBGC, 726 F.2d 839, 843 (D.C.Cir.1984), one explicit purpose of ERISA is to keep insurance premiums "at the lowest level consistent with [the PBGC] carrying out its obligations." See 29 U.S.C. § 1302(a)(3). We therefore acknowledge the legitimacy of considering the additional cost to employers of immediately and fully guaranteeing those benefits Title I requires to be vested.

Notwithstanding the legitimacy of cost considerations, nothing in the record before us indicates that the agency actually weighed those considerations with any care. Apart from a few general observations in internal memoranda about the added burden on employers and on the program, there is no evidence of any attempt by the PBGC at any point either in its decisionmaking process or in these proceedings even to estimate the additional costs associated with guaranteeing benefits under mandatory vesting provisions.[53] However rational it may have been for the PBGC to weigh the financial burden of guaranteeing those benefits, the PBGC did

---

**50.** The PBGC informs us that it is currently developing regulations to read the minimum vesting standards into unamended plans. Brief for Appellee at 54 n. 15. In addition, the overwhelming predominance of the "10-year cliff" standard for vesting, see supra note 4, would seem to make the PBGC's task simpler than it is portrayed.

**51.** The district court recognized that increased cost to the agency alone may not be a legitimate consideration in the decision whether to guarantee benefits under mandatory vesting amendments. Opinion at 18.

**52.** Opinion at 17–18.

**53.** The PBGC acknowledged in its answers to plaintiffs' interrogatories that it had not attempted to calculate the number of beneficiaries or the amount of money involved in its decision not to guarantee these benefits. See Answers of Defendant PBGC to Plaintiffs' First Set of Interrogatories, Rettig v. PBGC, Civ. No. 82–0517 (D.D.C. May 12, 1982), at 25.

not do so in any conscientious manner. Although we do not necessarily require the agency to support its policy decision with detailed cost calculations, neither is its decision made reasonable by the mere invocation of a factor that might legitimately have been influential in a reasoned decisionmaking process.

■ We are especially disappointed at the agency's cavalier cost-cutting in light of the truly momentous implications of its decision for many plan participants in the plaintiffs' circumstances. We will not belabor the human consequences of the agency's choice—we could do no better than to repeat the tragic facts of this case. But we do find it necessary to point out that this statute was passed with the overwhelming purpose of protecting the legitimate expectations harbored by millions of employees of a measure of retirement security at the end of many years of dedicated service.[54] The other statutory purposes—encouraging the growth of private pension plans and keeping down the costs of termination insurance for those plans—are important but necessarily secondary: those purposes have meaning only in light of the need for a fair and reliable system of retirement income security for employees.

■ The time-worn canon of statutory construction that requires the generous construction of remedial statutes is only a guideline that must of course give way to clear contrary legislative intent or to concrete and well-grounded policy considerations. But we have here a question of statutory construction in which the more generous reading, although not necessitated by the specific language and legislative history, is supported by the preponderance of evidence of specific congressional intent and by the compelling interests of the intended beneficiaries of this statutory scheme, which is animated throughout by a generous remedial purpose. The agency's reading of the statute, on the other hand, is supported by its marginal ease of administration and by unspecified and completely undocumented concerns for the costs of coverage. We conclude that, in the shadow of such disproportionate competing concerns, the agency's decision to phase in mandatory vesting improvements does not represent "a reasonable accommodation of conflicting policies ... committed to the agency's care by the statute." *Chevron,* —— U.S. at ——, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

### III. Conclusion

Congress' failure to address squarely and unambiguously the question of whether mandatory vesting improvements are subject to the statutory phase-in limitations has forced us to review the agency's choice—and its rationale for that choice—between possible interpretations of the statutory phase-in provisions. We readily

---

**54.** One principle of statutory construction teaches, of course, that remedial statutes are to be liberally construed to effectuate their purposes. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *International Union, U.A.W. v. Marshall,* 584 F.2d 390, 396 (D.C.Cir.1978). There can be no doubt that ERISA, and in particular its provision for termination insurance under Title IV, is a remedial statute: "One of Congress' central purposes in enacting this complex legislation was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. PBGC,* 446 U.S. at 374, 100 S.Ct. at 1732 (footnotes omitted). The PBGC itself has successfully argued in other cases that "coverage under [ERISA] should be liberally construed to provide the maximum degree of protection to working men and women ... [while] exemp-

tions should be confined to their narrow purpose." *Connolly v. PBGC,* 581 F.2d 729, 732 (9th Cir.1978) (quoting S.Rep. No. 127, 93d Cong., 1st Sess. 18 (1973)), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). *See also A–T–O, Inc. v. PBGC,* 634 F.2d 1013, 1020 (6th Cir.1980) (ERISA should be interpreted to "protect employees' expectations in their vested pension benefits"). Although the principle that remedial legislation is to be generously construed obviously "does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress," *Belland v. PBGC,* 726 F.2d at 844 (quoting *Symons v. Chrysler Corp.,* 670 F.2d 238, 241 (D.C.Cir.1981)), the overwhelming evidence of the remedial purpose of ERISA must be given due weight in construing provisions whose language and specific legislative history are susceptible of varying interpretations.

acknowledge that the PBGC is entitled to substantial deference in this grey area, but we believe as well that its rationale is subject to traditional review for reasonableness. In the absence of any articulated factual basis for the PBGC's alleged concern over the additional financial burden of guaranteeing these benefits, we cannot conclude that the PBGC has reached its decision on the basis of a reasonable accommodation of the policies underlying ERISA. However, neither can we require the agency to reverse its decision and guarantee the benefits of these plaintiffs without giving it an opportunity in the district court to provide such a rationale. Of course, the PBGC need not persuade the district court or this court that it made the correct choice. But it must provide some basis in the record for us to conclude that the agency "considered the matter in a detailed and reasoned fashion," *Chevron,* —— U.S. at ——, 104 S.Ct. at 2793, and made a reasonable decision.

*Reversed and remanded.*