Estella PAGE, Appellant,

v.

**PENSION BENEFIT GUARANTY
CORPORATION.**

**Mary E. COLLINS, Appellant,**

v.

**PENSION BENEFIT GUARANTY
CORPORATION, et al.**

**Nos. 91–5253, 91–5254.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 1992.

Decided July 10, 1992.

See also 130 F.R.D. 510.

Stephen R. Bruce, with whom Mark A. Borenstein was on the brief, for appellants in both cases.

Israel Goldowitz, with whom Carol Connor Flowe, Peter H. Gould, Jean Marie Breen and Charles G. Cole were on the brief, for appellees in both cases.

George B. Driesen was on the brief, for amicus curiae, American Association of Retired Persons. Robert L. Liebross also entered an appearance for amicus.

Before: MIKVA, Chief Judge; RUTH BADER GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH B. GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The named plaintiffs represent participants in terminated pension plans covered by the plan termination insurance program Congress prescribed in Title IV of the Employee Retirement Income Security Act of 1974 (ERISA). The plans in which plaintiffs participated had not been amended prior to termination to reflect the mandatory vesting provisions set out in ERISA Title I. *See* 29 U.S.C. § 1053(a). At the time their plans terminated, plaintiffs, based on their years of service, satisfied ERISA's minimum vesting requirements, but they did not meet the unlawful, more restrictive conditions for vesting still contained in their unamended plans.

The Pension Benefit Guaranty Corporation (PBGC), charged with administering the Act's plan termination insurance, refused to guarantee plaintiffs' benefits, because the class members did not have "nonforfeitable benefits ... under the terms of a plan." ERISA § 4022(a), 29 U.S.C. § 1322(a) (1976). The plaintiffs challenged the PBGC's construction of that critical language, and the district court granted summary judgment for the PBGC. We hold that the district court erred in its interpretation of the operative provision, ERISA § 4022(a), 29 U.S.C. § 1322(a) (1976). Accordingly, we reverse the summary disposition against plaintiffs and instruct reinstatement of the case.

### BACKGROUND

Congress designed ERISA to safeguard employees against the loss of anticipated retirement benefits, following decades of service, occasioned by (1) overly restrictive age and service vesting conditions, and (2) the absence of insurance protection when plans terminated with insufficient funds to cover vested benefits. *See* 29 U.S.C. § 1001(a).

Title I of the Act attends to Congress' determination to outlaw excessively restrictive prerequisites to vesting. That first Title of ERISA requires pension plans covered by the Act to provide for pre-retirement vesting determined by years of service, in compliance with minimum vesting standards set out in the statute; regardless of age, the longest term an employee may be required to work before vesting commences is 10 years. *See id.* § 1053(a). For pension plans in existence on January 1, 1974, ERISA's minimum vesting requirements became effective for plan years beginning after December 31, 1975; for post-January 1, 1974 plans, ERISA's vesting standards became effective immediately, *i.e.*, for plan years beginning after September 2, 1974, the date of ERISA's enactment. *Id.* § 1061(a), (b). As of those dates, plan vesting terms more restrictive than ERISA's minimum vesting standards became invalid under Title I. While provisions less generous than the ERISA minimum vesting standards are unlawful, plans may adopt more generous vesting schedules.

ERISA-qualified plans must be "maintained pursuant to a written instrument," and the plan document must specify the criteria for entitlement to benefits. Civil actions to enforce Title I's prescriptions may be brought by plan participants or by the Secretary of Labor; appropriate relief in such actions includes amendment of a plan to delete an unlawful vesting term. ERISA § 502(a), 29 U.S.C. § 1132(a).

Backing up ERISA's funding requirements, *see* 29 U.S.C. § 1082, and key to the congressional plan, Title IV establishes an insurance program to meet the problem of plans terminated without assets sufficient to cover vested benefits. As administrator of the guaranteed benefits program, the PBGC is "to provide for the timely and uninterrupted payment of pension benefits [within specified dollar limitations] to participants and beneficiaries under plans [covered by Title IV]" and "to maintain premiums ... at the lowest level consistent with carrying out its obligations under [Title IV]." *Id.* § 1302(a). The Secretary of Labor chairs the PBGC's three-member Board of Directors, which is completed by the Secretaries of Treasury and Commerce. *Id.* § 1302(d).

As enacted in 1974, ERISA § 4022(a) stated the scope of the PBGC's guarantee as follows:

Subject to the limitations contained in subsection (b), the corporation shall guarantee the payment of *all nonforfeitable benefits ... under the terms of a plan* which terminates [while covered by ERISA].

29 U.S.C. § 1322(a) (1976) (emphasis added). A vested benefit is one that is nonforfeitable. The PBGC had construed the words "nonforfeitable benefits ... under the terms of a plan" to mean that plan restrictions, although outlawed under Title I, could nonetheless hold sway to block guaranteed benefits under Title IV. To foreclose the PBGC's reading, Congress, in 1980, amended ERISA to provide insurance coverage, unequivocally, for "all nonforfeitable benefits." 29 U.S.C. § 1322(a) (1980). Congress defined "nonforfeitable benefit" to include "a benefit for which a participant has satisfied the conditions for entitlement *under the plan or the requirements of this chapter.*" Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (1980), *codified at* 29 U.S.C. §§ 1301(a)(8), 1322(a) (emphasis added). Introduced as technical amendments, the 1980 alterations were not made retroactive.

When a plan terminates with insufficient funds to cover its liability for benefits, the PBGC seeks appointment of a trustee, in practice, the Corporation itself, to collect the plan's assets and pay guaranteed benefits. 29 U.S.C. § 1342. The PBGC can recover deficiencies from the employer, subject to a cap of 30 percent of the employer's net worth. *Id.* § 1362. Any remaining gap between the plan's assets and guaranteed benefits is paid from insurance premiums charged to all covered ongoing plans. *See id.* § 1361.

Although ERISA's minimum vesting standards became effective as of the dates fixed in the Act, *see supra* p. 1311, formal implementation was not instantly mandated. *See id.* § 1030(a). For tax qualification purposes, plans could defer adopting amendments in line with the minimum stan-

dards until the end of the 1976 plan year or "such later time as the Secretary [of Treasury] may designate." Internal Revenue Code § 401(b). The Internal Revenue Service (IRS), which administers pension plan qualification for special, favorable tax treatment, several times permitted companies to postpone filing ERISA-conforming plan amendments. Eventually, the IRS set December 31, 1977 as the final deadline for filing the required amendments. *See* Information Release 1833 (Sept. 13, 1977), *reprinted in* 155 Pension Reporter (BNA) at A–1 (Sept. 19, 1977).

Not inconsistent with the unhurried pace set by the IRS for plan amendments conforming to ERISA, the Secretary of Labor issued regulations on the Act's disclosure requirements. *See* 29 U.S.C. § 1022. To guide plan sponsors, the Department of Labor offered a Model Notice. For plans not yet amended, the Department recommended informing participants that their plan

has NOT been amended to meet these [vesting] standards yet. ERISA requires that [the plan] apply the new standards to the plan year starting on [the start of the 1976 plan year]. But ERISA does not require the plan to make amendments by [that date]. The amendments may come later. When they are made, they must be applied back to [the start of the 1976 plan year].

29 C.F.R. § 2520.104b–5(c) (emphasis in original).

The companies that employed the class members in this action terminated their retirement plans after ERISA's vesting standards and insurance provisions became effective. The plans in question had not been amended prior to termination, however, to reflect ERISA's vesting schedules. At least in the cases of the named plaintiffs, participants had been informed of the new regime by notices that closely tracked the language of the Model Notice.

The M & M Transportation Co. unamended plan, in which named plaintiff Mary Collins had participated, afforded a vested right to retirement benefits at age 65 only if the participant both reached age 55 while

employed by the company and had at least 10 years of credited service. Before Collins turned 55, M & M declared bankruptcy. Although Collins had worked for M & M for more than 32 years, the age-while-employed requirement prevented her from gaining a vested right under the written terms of M & M's plan. The Federal's Inc. unamended plan, in which named plaintiff Estella Page had participated, included 10 years-of-service and age 55 requirements identical to M & M's. When Federal's closed shop and terminated its plan, Page, like Collins, had fulfilled the years-of-service requirement, but Page was then only 47 years old. The age 55 condition, as we earlier indicated, was unlawful under Title I of ERISA. *See* 29 U.S.C. § 1053(a).

When Collins and Page sought the PBGC's guarantee,[1] each received a letter from a PBGC staff member denying insurance coverage. Applying the age 55 requirement despite its illegality under Title I, the PBGC's staff concluded that Collins and Page had not met the standard of the original (pre–1980) ERISA § 4022(a), the provision in effect when the M & M and Federal's plans terminated. Under that standard, staff observed, only benefits "nonforfeitable ... under the terms of a plan" were guaranteed. The letter from the PBGC explained to Page:

> The vesting requirements of your pension plan state that participants must reach age 55 and complete 10 years of credited service to be eligible for a retirement benefit. Although you met the years of credited service requirement, in order to be eligible both requirements must have been met on the date the plan terminated. Thus, records from your employer show that you were not vested on the date your plan terminated. Accordingly, you are not eligible for a guaranteed retirement benefit.

1. Page claims $104 per month when she reaches 65; Collins, who reached 65 in May 1990, claims $308.95 per month.

2. The district court later denied without explanation plaintiffs' motion to alter or amend the judgment. In that motion, Page and Collins argued that even if PBGC's interpretation of

Letter to Estella Page from Lawrence M. Bobier, Branch Manager, PBGC (July 22, 1985). Collins received the same explanation.

The district court regarded the case as one turning on a statute's plain meaning. Concluding that in ERISA § 4022(a), 29 U.S.C. § 1322(a), Congress "precisely addressed the issue," Memorandum, C.A. Nos. 88–3406 & 89–2997, at 2, 1991 WL 186997 (D.D.C. Feb. 8, 1991) (Mem.Op.), and citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the district court stated that "the agency and court must give effect to the intent of Congress." Mem.Op. at 2–3.[2] That intent, the district judge thought it clear, was to deny the insurance coverage sought here. Accordingly, the district judge granted the PBGC's motion for summary judgment.

## ANALYSIS

Our initial question, as instructed by the Supreme Court's 1984 leading decision in *Chevron,* is whether Congress had a specific intent regarding the matter at hand. In ERISA § 4022(a), 29 U.S.C. § 1322(a) (1976), as originally enacted, Congress used the phrase "nonforfeitable ... under the terms of a plan." By that language, did Congress mean to deny insured benefits to employees based on restrictive plan vesting requirements invalid under Title I?

■ On a "plain meaning" or specific intent question of this order, we do not defer unduly to an agency's analysis; instead, we uphold and enforce congressional judgments or rules whose meaning statutory language or legislative history has made manifest. *See Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. If it appears, however, that "Congress did not actually have an intent" regarding the stat-

ERISA § 4022(a) prevailed, their complaints alleged alternate grounds for relief that were left unaddressed by the court in the summary judgment proceedings. The *Page* complaint, for example, alleged that plaintiffs qualify for a guarantee of benefits vested under lump-sum options in their plans.

utory construction question at issue, we will uphold a reading by the agency entrusted with the statute's administration if the agency's reading "represents a reasonable accommodation of conflicting policies [Congress] committed to the agency's care." *Id.* at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)); *see Rettig v. PBGC,* 744 F.2d 133, 141 (D.C.Cir.1984) (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82).

▮ We part ways with the district court on the initial "plain meaning" or specific intent inquiry. Section 4022(a)'s original language, "nonforfeitable ... under the terms of a plan," this court has previously determined, can be variously interpreted. In *Rettig,* we considered the statutory construction issue at length, exhaustively examining ERISA and its legislative history. *See* 744 F.2d at 143–50.[3] The *Rettig* court identified "several plausible interpretations" of the phrase "nonforfeitable ... under the terms of a plan." *Id.* at 143. First, Congress may have assumed that plans would be amended to comply with ERISA without long delay, in which case the "terms of a plan" promptly would become at least as generous as the ERISA-mandated minimum. Second, "[e]ven if Congress anticipated the problem of un-amended or late-amended plans, it might have intended that the minimum vesting standards be read into nonconforming plans, thus becoming legally implied 'terms of the plan.'" *Id.* Both of these plausible interpretations support plaintiffs' case. Under either reading, the 1980 amendment served simply to clarify the law and to bar explicitly the PBGC's contrary interpretation. *See also id.* at 143 n. 30. Third, Congress may have intended the plan

terms to remain operative for Title IV purposes, even when those same terms would be manifestly unlawful if applied by the employer to deny a participant's benefits under Title I.

After reviewing the legislative history, *id.* at 144–49, the *Rettig* court concluded that the third reading was the least likely. Congress probably intended section 4022(a) "to provide for the guarantee of at least those benefits that Title I required to be vested." *Id.* at 146. Dicta in *Nachman Corp. v. PBGC,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), supports this view. The Court in *Nachman* held that a plan's limitation of liability to the assets of the fund upon termination did not prevent vested benefits from being "nonforfeitable" and thus covered by Title IV. Nachman had terminated its plan the day before ERISA's vesting requirements became effective; the Court observed that "[h]ad petitioner waited another day to terminate, Title I's vesting standards would have become effective, thereby increasing the number of employees whose benefits would have become vested ... and therefore insurable under Title IV." *Id.* at 384, 100 S.Ct. at 17.

Congress' failure in 1974 to say whether unlawful vesting terms retained in a plan could eliminate the PBGC's obligation to guarantee benefits is not difficult to comprehend. The absence of reasonably prompt formal compliance was largely due to successive IRS decisions, for administrative convenience, to extend the time for filing plan amendments. The prolonged disparity between legal requirement and plan content may have been affected, as well, by the Department of Labor's regulation concerning the disclosure required of plans under the statute.[4] The suggested

---

**3.** The *Rettig* court reviewed the reasonableness of the PBGC's determination that ERISA's phase-in provisions, 29 U.S.C. § 1322, applied to ERISA-mandated vesting improvements. The *Rettig* court's discussion of the statutory language here at issue was highly relevant, if not essential, to that panel's conclusion that the PBGC had failed adequately to justify the challenged application of the phase-in prescriptions. We adopt *Rettig's* analysis of the key language in section 4022(a) not as precedent we are

bound to apply, but because of the persuasiveness of the *Rettig* panel's analysis.

**4.** The regulation was intended to implement the Act's requirement that participants be informed, in writing, of their rights under the plan "in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a)(1). Consistent with this statutory direction, the Model Notice states, "ERISA requires plan administrators—the people who run plans—to tell

notice to participants contained no warning that a plan's failure to amend might have adverse consequences for the participant. *See supra* pp. 1312–13. Plan members receiving disclosure notices conforming to the Department's model would not have been alerted by the notice to any need to bring suit to force ERISA-conforming amendment of their plans. Without prevision of these post-enactment developments, Congress, in 1974, as the court suggested in *Rettig,* 744 F.2d at 144–47, probably did not train its attention on the incidence and effect of plans and the law long out of sync.

The PBGC's argument, that the meaning of the original ERISA § 4022(a) is plain, seems to us unimpressive in this light. The PBGC stresses the Title I civil enforcement provision authorizing actions "to enjoin any act or practice which violates any provision of [Title I] *or* the terms of the plan, or ... to enforce any provisions of [Title I] *or* the terms of the plan." ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (emphasis added). Original section 4022(a) of Title IV, in contrast, speaks only of "the terms of a plan," not of the "provisions of [Title I]." Congress, the PBGC therefore maintains, must have meant to guarantee only benefits vested according to the express provisions of a plan, not those attributable to the provisions of ERISA.

The two sections contrasted by the PBGC, however, have different offices. ERISA § 502(a)(3) allows plan participants to enforce against employers *both* their obligations under Title I and any more generous terms in a particular plan. If, however, Congress either (1) assumed that all plans would be amended, without long delay, to conform to ERISA's vesting rules or (2) intended that those rules be implied as contract terms, then reference to Title I obligations in section 4022(a), the benefit guarantee scope provision, would have appeared largely superfluous. On the other hand, the phrase "terms of a plan" in section 4022(a) would not be surplusage under this reasoning, because a plan might have a

vesting schedule more generous than that required by Title I. Section 4022(a)'s reference to "terms of a plan," in that event, would serve to obligate the PBGC to guarantee benefits vested under those more generous terms.

Congress' 1980 amendment of section 4022 cannot place the original guarantee language in the "plain meaning" category. The brief legislative history of the 1980 technical amendments is equivocal, and surely does not "ratify" the PBGC's view that the 1974 section 4022(a) language left the Corporation no choice but to deny guarantee status to the benefits here in question. *See Rettig,* 744 F.2d at 148–49 (quoting 126 Cong.Rec. 23,288 (1980) (statement of Senator Williams); 126 Cong.Rec. 23,041 (1980) (statement of Representative Thompson)). In any case, Congress' view in 1980 of what an earlier, 1974 Congress intended is not controlling. *See, e.g., Universities Research Ass'n v. Coutu,* 450 U.S. 754, 778, 101 S.Ct. 1451, 1465, 67 L.Ed.2d 662 (1981).

■ Because we find that Congress did not "precisely address" the issue before us, we proceed to the next inquiry—was the PBGC's interpretation of the original section 4022(a) a reasonable one in view of the policies that underlie ERISA. *See Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783; *Rettig,* 744 F.2d at 151. Turning to that inquiry, we conclude that the PBGC did not engage in decisionmaking of the character required by the Corporation's regulations.

The PBGC's bylaws provide that certain enumerated powers "are expressly reserved to the Board of Directors and shall not be delegated"; these nondelegable powers include: "Final decision on any policy matter that would materially affect the rights of a substantial number of employers or covered participants and beneficiaries." 29 C.F.R. § 2601.3(b)(5). Counsel for the PBGC has acknowledged that no Board of Directors "final decision" addresses the instant controversy. Instead,

you the most important facts you need to know, in writing and free of charge." 29 C.F.R.

§ 2520.104b–5(c).

the PBGC has been acting on its General Counsel's reading of the statute.[5] Further, the PBGC agrees, even emphasizes, that thousands of plans, and hence a significant number of participants covered under Title I, are potentially affected by the Corporation's interpretation of section 4022(a) as originally enacted. In view of the room for interpretation section 4022(a) originally left, and the substantial consequences of the choice among interpretations, it can hardly be doubted that the reconciliation of Title I and Title IV here at stake involves matters of policy.

An agency must abide by its own regulations, *see, e.g., Reuters Ltd. v. FCC,* 781 F.2d 946, 947 (D.C.Cir.1986) (FCC erred in refusing to apply its own filing regulation), and we therefore find ourselves without a reliably final agency decision meet for judicial review. Even if the reasons offered by the PBGC's counsel in response to this litigation had sufficed to justify the Corporation's restrictive reading of "terms of a plan," the PBGC Board's silence would have made the summary judgment for defendants premature.

While we are directing the district court, on return of this case, to invite the Board's first-instance decision, we note our grave doubt whether the interpretation put forward by the PBGC staff is "consistent with the underlying statutory scheme in a substantive sense"; we also question "whether 'the agency considered the matter in [the requisite] reasoned fashion.'" *See Rettig,* 744 F.2d at 151 (quoting *Chevron,* 467 U.S. at 865, 104 S.Ct. at 2793).

As we stated at the outset, and as the *Rettig* decision underscores, Congress enacted ERISA to remedy

> two critical weaknesses in private pension plans.... First, many plans had provisions so restrictive in terms of vesting, participation, accrual and other respects that only a fraction of the employees participating in the plan ever became entitled to any pension benefits.... Sec-

ond, too many plans terminated with insufficient assets to pay the benefits to which participants were entitled, leaving long-time employees totally bereft of pension protection in their final years.

*Rettig,* 744 F.2d at 141; *see also Nachman,* 446 U.S. at 374–75, 100 S.Ct. at 1732–33. Notably, the PBGC's application of ERISA-barred vesting standards to deny guaranteed benefits to employees in plaintiffs' situation perpetuates the very weaknesses Congress sought to cure.

The "personal tragedy" suffered by members of the plaintiffs' class, *see Nachman,* 446 U.S. at 374 & n. 21, 100 S.Ct. at 1733 & n. 21, stemmed largely from the permission the IRS gave for postponement of formal, ERISA-conforming plan amendments. *See supra* p. 1312. Neither the IRS, however, nor the Department of Labor, in framing its disclosure regulation, *see supra* pp. 1312–13, appears to have contemplated that pre-ERISA plan terms, not immediately altered to reflect ERISA's Title I vesting standards, would control coverage under Title IV. Indeed, the Model Notice, written by the Department of Labor "in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a)(1), *see supra* pp. 1312–13, 1314–15 and note 4, conveyed the message that ERISA's substantive standards would govern in full from the start of the 1976 plan year.

The PBGC advances several arguments relating to the high cost to the insurance scheme if the PBGC guaranteed the benefits in question. In addressing these concerns, however, the PBGC must hold in full view the Corporation's Title IV obligations; the PBGC is "to maintain premiums ... at the lowest level *consistent with carrying out its obligations under this subchapter.*" 29 U.S.C. § 1302(a)(3) (emphasis added). The cost of the guarantee, the equity of imposing on employers with adequately funded plans responsibility to compensate

---

5. The absence of a Board decision is consistent with the PBGC's position in this case that the statutory language is clear on the question presented; if that were correct, the PBGC staff's denial of guaranteed benefits would not impli-

cate policy matters "committed to the agency's care by the statute." *See Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

for underfunding by others, and the administrative burden on the PBGC were it required to guarantee the benefits plaintiffs seek, are considerations subordinate to ERISA's core purpose. As we observed in *Rettig:*

> [T]his statute was passed with the overwhelming purpose of protecting the legitimate expectations harbored by millions of employees of a measure of retirement security at the end of many years of dedicated service. The other statutory purposes—encouraging the growth of private pension plans and keeping down the costs of termination insurance for those plans—are important but necessarily secondary: those purposes have meaning only in light of the need for a fair and reliable system of retirement income security for employees.

744 F.2d at 155 (footnote omitted).

### CONCLUSION

Satisfied that the statutory phrase on which this case turns, in context, admits of more than one interpretation, we reverse the summary judgment entered for the PBGC. Before renewing its consideration of the case, the district court should make certain that it has before it the PBGC's "final decision." For that reason, we instruct the district court to invite a submission by the PBGC consistent with the regulation stating that the Corporation's Board has nondelegable authority to render "[f]inal decision on any policy matter that would materially affect the rights of a substantial number of employers or covered participants and beneficiaries." 29 C.F.R. § 2601.3(b)(5). The submission should be made without undue delay, within 90 days of the issuance of this opinion, absent exigent circumstances.

If the PBGC, on remand, adheres to the view that plaintiffs do not qualify for guaranteed benefits, the Corporation must show that its position is "a reasonable accommodation of the policies underlying ERISA." *See Rettig,* 744 F.2d at 156. That showing is absent on the current record, the PBGC having argued, and the district court having sustained, a "plain meaning" position

we find insupportable. If it becomes appropriate to do so, the district court should attend to the alternate claims plaintiffs stressed in their motion to alter or amend the judgment. *See supra* note 2 (district court gave no explanation for denying the motion to alter or amend the judgment).

For the reasons stated, the judgment from which this appeal has been taken is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*